UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

EXCLUSIVE GROUP HOLDINGS, INC.,

     *Plaintiff,*

v.                                            No. 2:22-CV-474-JES-NPM

NATIONAL UNION FIRE INSURANCE CO.
OF PITTSBURGH, PENNSYLVANIA ET AL.,

     *Defendants.*

## FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 3

PARTIES ............................................................................................................................. 4

JURISDICTION & VENUE ............................................................................................... 5

FACTUAL BACKGROUND .............................................................................................. 5

    **A.** *Business Background* ............................................................................... 5

    **B.** *Insurance Relationship and Policies* ...................................................... 8

        1. *Buyer Approval Process* ...................................................... 12

        2. *Country Approval Process* ................................................... 13

        3. *Claims Process* .................................................................... 15

    **C.** *2019 Insurance Claim* .......................................................................... 15

    **D.** *The Disputed Insurance Claims* ............................................................ 16

EXCLUSIVE REJECTS and DOES NOT AGREE TO ARBITRATION ........................... 26

COUNT I:  BREACH OF CONTRACT AGAINST NUFIC ............................................. 27

COUNT II:  TORTIOUS INTERFERENCE AGAINST BBCG, AIG CLAIMS, AND AIG ................................................................................................................................. 28

COUNT III:  NEGLIGENCE AGAINST BBCG, AIG CLAIMS, AND AIG ................... 29

DEMAND FOR JURY TRIAL .......................................................................................... 30

SCHEDULE 1 .................................................................................................................... 32

EXHIBIT A ........................................................................................................................ 36

EXHIBIT B ........................................................................................................................ 43

EXHIBIT C ........................................................................................................................ 69

EXHIBIT D ...................................................................................................................... 109

EXHIBIT E ...................................................................................................................... 111

EXHIBIT F ...................................................................................................................... 113

EXHIBIT G ...................................................................................................................... 118

EXHIBIT H ...................................................................................................................... 121

Plaintiff Exclusive Group Holdings, Inc. ("Exclusive Group"), by and through undersigned counsel, hereby files its Amended Complaint against Defendants National Union Fire Insurance Co. of Pittsburgh Pennsylvania ("NUFIC"), BBCG Claims Services ("BBCG"), AIG Claims, Inc. ("AIG CLAIMS"), and American International Group, Inc. ("AIG") (collectively, "Defendants") and alleges as follows:

## INTRODUCTION

1.     This is an action for breach of contract, tortious interference, and negligence arising from Defendants' concerted effort to frustrate, delay, thwart, and ultimately deny the payment of Exclusive Group's valid and timely insurance claims under insurance policies issued by NUFIC (hereinafter "Claims"). *See* **Schedule 1**.

2.     Although Defendants had indemnified Exclusive Group for nearly-identical trade insurance claims under nearly-identical NUFIC insurance policies in the past, here, Defendants stepped into the process immediately before David Kim, an employee of AIG CLAIMS and AIG, was going to authorize indemnification of the Claims.

3.     AIG CLAIMS and AIG hired BBCG to investigate the Claims.  This was intentionally designed to create a roadblock.  With the assistance of BBCG, Plaintiff was then peppered with an odyssey of unwarranted and intentionally obstructive inquiries by Defendants' representatives, particularly in light of Defendants' prior indemnification of nearly-identical claims.

4.     Indeed, Defendants tried to take issue with Exclusive Group's choice of customers when NUFIC and AIG had already vetted and approved Exclusive Group's customers under the insurance policies at issue.

5.     Ultimately, Defendants denied the Claims and as a result of Defendants' actions,

Exclusive Group has been unable to recover the trade credit Exclusive Group extended to its customers which it is owed under the insurance policies, sustained substantial losses to its current and future business revenues because Defendants have effectively "frozen" all or substantially all of Exclusive Group's capital used to run its business operations, and incurred reputational harm hampering its access to capitalize on additional opportunities.

<u>**PARTIES**</u>

6.      Exclusive Group is a corporation organized under the laws of the State of Florida with its principal place of business in Naples, Florida.

7.      Defendant NUFIC is organized under the laws of the State of Pennsylvania with its principal place of business in the State of New York. NUFIC is licensed as an insurer and registered to do business in, and is in fact, doing business in the State of Florida. NUFIC is a wholly-owned subsidiary of AIG Property Casualty U.S., Inc.

8.      Defendant AIG CLAIMS is organized under the laws of the State of Delaware with its principal place of business in the State of New York. AIG CLAIMS is registered to do business in, and is in fact, doing business in the State of Florida. AIG CLAIMS is a direct, wholly-owned subsidiary of AIG Property Casualty, Inc. and a member company of AIG.

9.      Defendant BBCG is a Canadian company headquartered in Ontario, Canada. Defendants appointed BBCG to assist them in the review of several of the Claims listed in **Schedule 1**.

10.     Defendant AIG is organized under the laws of the State of Delaware with its principal place of business in the State of New York. AIG is no longer registered to do business in, but is in fact, doing business in the State of Florida. It is believed that AIG is the controlling parent company of the named Defendants and is the second largest underwriter of insurance in the

United States.

11.     All defendants are collectively referred to herein as "Defendants."  Defendants AIG

CLAIMS and AIG are collectively referred to herein as "AIG Defendants."

## JURISDICTION AND VENUE

12.     This action is properly within the jurisdiction of this Court pursuant to 28 U.S.C. §

1332(a) because the matter in controversy exceeds the sum or value of $75,000 and is between

citizens of different States.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1441(a) and 28 U.S.C. §

89(b) because this District embraces Collier County, Florida, the place from where this action was

removed.

14.     Jurisdiction and venue are also proper in this District because NUFIC, and the other

Defendants are engaging in or carrying on the business of issuing, underwriting, insuring and/or

servicing insurance policies and claims for persons and entities in the State of Florida and/or has

an office or agency in Florida, and NUFIC has entered into a contract of insurance to insure

Exclusive Group, a business located in the State of Florida.

## FACTUAL BACKGROUND

### A.  Business Background

15.     Exclusive Group is a domestic wholesaler of international telecommunications.

Exclusive Group purchases long distance minutes from its suppliers and resells those minutes at a

markup to its customers (each a "Customer" or "Buyer") allowing for the termination (*i.e.*,

connection) of international phone calls to specific destinations.

16.     The process of receiving purchased minutes and delivering sold minutes is called

"call routing." Call routing occurs on a switch and is the process that allows a telephone call to

connect allowing two end users to have a phone conversation. The duration of each live phone call is the minutes purchased and sold. Calls are "originated" when one user dials a telephone number. Calls are "terminated" when the destination user answers the phone call and the call is connected.

17.     Often, especially in the case of international phone calls, a chain of several intermediary telecommunications carriers is required to complete this connection process, with each carrier involved in the chain purchasing, taking custody and control, and reselling the phone call as it is routed to its destination. These transactions occur in real time at close to the speed of light.

18.     Exclusive Group is one of these intermediaries; it does not originate or terminate phone calls with end users.

19.     Exclusive Group has a network of industry-standard telecommunication service agreements with its Customers and suppliers that sets forth the terms for purchasing and selling telecommunications services, billable in minutes or fractions of minutes. Exclusive Group's standard form Reciprocal Telecommunications Carrier Services Agreement is attached hereto as **Exhibit A**.

20.     All telecommunication minutes purchased and sold by Exclusive Group were pursuant to a duly executed Reciprocal Telecommunications Carrier Services Agreement.

21.     Exclusive Group paid for and was invoiced for the minutes provided to Exclusive Group by its suppliers. Exclusive Group invoiced Customers and Customers paid Exclusive Group for the minutes sold to them.

22.     As is common practice in the telecommunications industry, Exclusive Group leased a softswitch for the purpose of establishing, maintaining, routing, and terminating international voice calls with its interconnected wholesale telecommunications suppliers and Customers.

23.     Exclusive Group used its softswitch to receive purchased international telecommunication minutes from its suppliers and provide sold international telecommunications minutes to its Customers electronically via a Voice over Internet Protocol ("VoIP") internet architecture.

24.     Through its softswitch, Exclusive Group had exclusive control and custody of the telecommunications minutes purchased and sold to its Customers.

25.     The tracking, use, receipt, delivery, and consumption of the long-distance minutes purchased by Exclusive Group and sold to its Customers is completed on its softswitch. The softswitch is used to effect the real-time purchase and sale of telecommunications minutes, which connects a live phone call.

26.     The softswitch documents the electronic call data, consumption, and receipts for Exclusive Group's purchase and receipt of telecommunications minutes from its vendors.

27.     The softswitch also documents the electronic call data, invoicing, delivery for each Customer's consumption and receipt of telecommunications minutes purchased from Exclusive Group.

28.     The softswitch allows the voice phone calls to be connected and creates a Call Detail Record ("CDR"). A CDR provides metadata - data about data - regarding each transmission of data between an intermediary, like Exclusive Group, and its customers or vendors including, but not limited to, whether the call connected, when the call took place (date and time); how long the call lasted (duration); who called whom (source and destination phone numbers); what kind of call was made (inbound/outbound, toll-free); the originating and receiving Internet Protocol address ("IP Address") and how much the call cost (based on a per minute rate set by the parties).

29.     Essentially, the operation to establish, maintain, and terminate a phone call

connection occurs on the softswitch: the valid purchase, sale, receipt, custody, control, delivery, and consumption of the voice or data minutes are tracked on the softswitch which tabulates infinite details about the minutes received by Exclusive Group from its suppliers, the minutes sold to and consumed by Exclusive Group's Customers, and compiles that certain electronic data into a CDR.

30.     The CDR is the definitive record in the telecommunications industry that documents the existence, sale, consumption and transmission of long-distance minutes and data minutes through a softswitch.

31.     To engage in its business, Exclusive Group most commonly provides credit terms to its Customers, but pays its vendors upfront for minutes. This mismatch in payment terms requires Exclusive Group to use its own capital to prepay its vendors while it waits to be paid by its Customers. Because this working capital requirement exceeded Exclusive Group's own retained earnings, Exclusive Group borrowed this capital from its founder, Mary Mooney (f/k/a Mary Todd), her husband, and several investors.

### B.  Insurance Relationship and Policies

32.     Because Exclusive Group primarily extends trade credit to its Customers, Exclusive Group set out to obtain a trade credit insurance policy—a customary industry practice—as a means to mitigate risk.

33.     In or around March 2018, Exclusive Group selected Trade Risk Group LLC ("TRG"), a specialty broker of domestic and export trade credit insurance, to become its insurance representative and procure a trade credit insurance policy.

34.     In May 2018, Exclusive Group received non-binding indications for trade credit insurance from several major insurance companies including one issued from Jasmina Vigil, a senior underwriter at AIG (an "AIG NBI").

35.     The AIG NBI contains one line indicating the issuing company will be NUFIC despite being emblazoned with a large AIG logo header on each page its five pages and its cover page highlighting the "AIG Trade Credit Policy Features."



36.     Ultimately, Exclusive Group chose to forgo the other trade credit insurance offers and selected an "AIG Trade Credit Policy." On May 30, 2018, Exclusive Group accepted an amended AIG NBI by signing a Credit Insurance Quotation Acceptance form prepared by TRG, which indicates AIG as the underwriter for Exclusive Group's new insurance policy.

37.     In response, Defendant NUFIC issued through Jasmina Vigil – a senior underwriter at AIG – an AIG-branded "Binding Confirmation of Coverage", which reiterated the terms and conditions set forth in the AIG NBI and included an initial list of Buyers approved for coverage under the forthcoming insurance policy. Like the AIG NBI, the "Binding Confirmation of Coverage" contains one line indicating the issuing company will be NUFIC despite being emblazoned with a large AIG logo header on each of its five pages and its cover page also highlighting the "AIG Trade Credit Policy Features."

38.     On June 26, 2018, Defendant NUFIC issued its first AIG-branded "Domestic and Export Trade Credit Insurance Shipments Form" insurance policy, Policy Number 11184726 to Exclusive Group, the insured, for a policy period of June 1, 2018 to June 1, 2019. The policy was

transmitted along with a cover letter prepared by or on behalf of Jasmina Vigil—a senior underwriter with AIG.

39.     Exclusive Group would go through the same procedure in 2019 and 2020 during its policy renewal process. Each year Exclusive Group accepted the AIG NBI by signing a Credit Insurance Quotation Acceptance form prepared by TRG, indicating AIG as the underwriter for Exclusive Group's insurance policy. Each year Exclusive Group received an AIG "Binding Confirmation of Coverage" containing one line indicating the issuing company will be Defendant NUFIC despite being emblazoned with a large AIG logo header on each page its five pages and its cover page highlighting the "AIG Trade Credit Policy Features." True and accurate copies of each AIG NBI, Credit Insurance Quotation Acceptance form, and AIG Binding Confirmation of Coverage are attached hereto as **Exhibit B.**

40.     On June 10, 2019, Defendant NUFIC renewed Exclusive Group's trade credit insurance coverage by issuing a "Domestic and Export Trade Credit Insurance Shipments Form" insurance policy, Policy Number 11184726-19 to Exclusive Group, the insured, for a policy period from June 1, 2019 to June 1, 2020. On July 9, 2020, Defendant NUFIC again renewed Exclusive Group's trade credit insurance coverage by issuing another "Domestic and Export Trade Credit Insurance Shipments Form" insurance policy, Policy Number 11184726-20 to Exclusive Group, the insured, for a policy period from June 1, 2020 to June 1, 2021 (together, the "Policies"). Both Policies were issued on AIG-branded letterhead and were transmitted with a cover letter prepared by or on behalf of Jasmina Vigil—a senior underwriter at AIG. True and accurate copies of both Policies are attached hereto and incorporated herein as **Exhibit C.**

41.     For the period June 1, 2018 through June 1, 2021, Defendant NUFIC agreed to indemnify Exclusive Group against losses directly caused by the failure of any Buyer to pay

Exclusive Group all or part of the invoice value of the Eligible Shipments within the waiting period under successively renewed insurance policies as described in ¶¶32 through 40.

42.     Under the Policies, "Eligible Shipment(s)" means any and all shipment(s) of Goods Insured to the buyer pursuant to the contract of sale, provided that the goods insured are: (1) shipped during the Policy Period. Shipment begins when the goods insured have left the custody and control of the insured or its agent in transit to the buyer; (2) delivered as required under the contract of sale; (3) sold for contract currency and in accordance with the maximum terms of payment; and (4) shipped in conformity with the applicable export laws and regulations of the insured's country and the import laws and regulations of the buyer's country.

43.     The Goods Insured were defined by the Policies as: "Long distance minutes and data minutes."

44.     Under the Policies, the Goods Insured were insured for "90% unless otherwise noted."

45.     The amount payable by Defendant NUFIC will be calculated in accordance with SECTION V., Proof and Payment of Claims and Recoveries, and will be subject to the Policies' limit of liability and other applicable terms and conditions of the Policies.

### *1.   Buyer Approval Process*

46.     As a condition precedent of coverage of any Buyer under the Policies, NUFIC required that Buyer information be submitted, reviewed, and approved electronically via AIG's Uniform Resource Locator accessible at http://www-222.AIG.com/globallimits.

47.     All decisions regarding Buyer submissions to AIG's Uniform Resource Locator were accessible in AIG's Uniform Resource Locator and also transmitted to Exclusive Group by TradeCredit@AIG.com. A sample screenshot of a Buyer approval in AIG's Uniform Resource

Locator is attached hereto as **Exhibit D**, and a sample email of a Buyer approval from TradeCredit@AIG.com is attached hereto as **Exhibit E.**

48.     Buyer approvals under the Policies were further manually reviewed and confirmed by Jasmina Vigil—a senior underwriter at AIG –using an @AIG.com email address. Any additional or supplemental correspondence related to underwriting and Buyer approvals under the NUFIC-issued Policies were solely through Jasmina Vigil. A sample email exchange between Exclusive Group  and Jasmina Vigil of the Buyer approval process is attached hereto as **Exhibit F.**

49.     As part of this Buyer approval process, Defendant AIG would determine the approved limit for each Buyer and the maximum terms of payment under which Exclusive Group could transact business with the approved Buyer and NUFIC would be required to indemnify under the Policies. Effectively, Defendant AIG decided the maximum invoice value and payment schedule for each of Exclusive Group's Buyers. *See* **Exhibit B,** Binding Confirmation of Coverage, Maximum Payment Terms and Approved Buyers.

## 2.     *Country Approval Process*

50.     Before Exclusive Group could even submit any Buyer information for approval under the process outlined in ¶¶46 through 49, Defendant NUFIC required Exclusive Group to get preapproval from an AIG underwriter to transact business in the Buyer's country.

51.     Exclusive Group, directly or through Trade Risk Group, worked solely with Jasmina Vigil—a senior underwriter at AIG—to obtain country approvals.

52.     In seeking country approval, Exclusive Group was required to submit via electronic mail a list of proposed Buyers located in the country that it sought to do business with as well as provide the estimated volume of business.  From time to time, Jasmina Vigil—a senior underwriter

at AIG—would require additional information, such as Buyer financial statements before approving (or denying) Exclusive Group to do insured business with a prospective Buyer located in a certain country. A sample email exchange between Exclusive Group and Jasmina Vigil of the country approval process is attached hereto as **Exhibit G**.

53.     For countries where Exclusive Group received approval from Jasmina Vigil—a senior underwriter at AIG—Defendant AIG would place a maximum limit on the total volume of business that Defendant NUFIC would insure and indemnify as well as set the waiting period— essentially the length of time Exclusive Group would have to wait without getting paid from its Buyer before it could submit a claim for indemnification and payment from NUFIC. *See* **Exhibit C**, Endorsement Nos. 1.

54.     Accordingly, under the Policies, Defendants not only knew but actively determined what countries Exclusive Group could transact in, which Buyers Exclusive Group could transact with within those countries, how much Exclusive Group could sell to those Buyers, the timeframe under which Exclusive Group's Buyers had to pay invoices, and in the event of a Buyer nonpayment, the length of time Exclusive Group had to wait before it could seek indemnification and payment from Defendant NUFIC.

55.     At no time during the initial policy procurement process, policy renewals, Buyer approval process or country approval process did Exclusive Group communicate with any individual, agent or employee representing to be associated, affiliated, or employed by Defendant NUFIC. All email correspondence originated from @AIG.com email addresses and from persons with "AIG"—not "NUFIC"—in their signature lines.

56.     For all Buyer approval submissions and country approval submissions, Exclusive Group regularly and routinely relied on standard corporate documentation, including but not

limited to company formation documents, certificates of good standing from the relevant regulating bodies, and regulatory records, to verify the validity and existence of any Buyer prior to submission to Defendants.

57.     For all Buyer approval submissions and country approval submissions that required additional Buyer documentation, such as Buyer financial statements, Exclusive Group would routinely request that information from the Buyers and forward it onto Defendants in the event it was not submitted directly by the Buyer to Defendants. Exclusive Group relied on the information it received in these requests as true and accurate representations from its Buyers.

### 3.   *Claims Process*

58.     In the event of a claim arising under the Policies, Defendant NUFIC requires Exclusive Group to complete an AIG-branded "Proof of Loss Form (Companies) Trade Credit Insurance" (the "Proof of Loss Form") and to remit the Proof of Loss Form, along with a substantial amount of documentation evidencing the claim, to one or more of the Defendants at TCPRClaimsUS@AIG.com. A true and accurate copy of the AIG-branded Proof of Loss Form is attached hereto as **Exhibit H.**

59.     The Proof of Loss Form further contains a section titled "Section V. Release and Assignment", which Defendants indicate completion is optional, but completion of this section "will expedite payment of this Claim".

### C.  *2019 Insurance Claim*

60.     In or around July 2019, Exclusive Group in good faith exercised its right for indemnification under the first AIG-branded policy issued by Defendant NUFIC (¶38, Policy Number 11184726) and accordingly submitted an insurance claim for nonpayment by an AIG-Approved Buyer of the Goods Insured and delivered by Exclusive Group (the "2019 Claim"),

through TRG. The submission included a Proof of Loss Form with Section V. completed along with the required claim documentation sent via electronic mail to one or more of the AIG Defendants at TCPRClaimsUS@AIG.com.

61.     Throughout the 2019 Claim review process, Exclusive Group corresponded via electronic mail and phone conference directly with David Kim, a Severity Claims Adjustor – Trade Credit & Political Risk Claims at AIG Special Risk Claims. Email correspondence was sent to David.Kim3@AIG.com, indicating Kim is an employee, representative or agent of one or more of Defendants.

62.     On October 11, 2019, Exclusive Group received notice from Kim that indemnity for the 2019 Claim had been issued. On October 12, 2019, Defendant AIG issued a check on behalf of NUFIC, without incident, for Exclusive Group's 2019 Claim:



### D. The Disputed Insurance Claims

63.     In the period from August 2020 to October 2020, Exclusive Group again, in good faith, sought to timely exercise its right for indemnification under the AIG-branded Policies issued by Defendant NUFIC (¶40, Policy 11184726-19 and Policy 11184726-20) and accordingly submitted a number of insurance Claims for nonpayment by an AIG-Approved Buyer of the Goods

Insured and delivered by Exclusive Group. *See* list of Claims in **Schedule 1.**

64.     All Claims submissions listed in Schedule 1 included a Proof of Loss Form with Section V. completed along with the required claim documentation sent via electronic mail to one or more of the Defendants at TCPRClaimsUS@AIG.com.

65.     All Claims, their respective Buyers (the "Claimed Buyers"), and the Claimed Buyers' country listed in Schedule 1 are covered under one or more of the Policies.

66.     All Claimed Buyers listed in Schedule 1 were reviewed and approved by one or more of the Defendants through the Buyer approval process indicated in ¶¶46 through 49 for coverage under the Policies. *See* **Schedule 1** for each of the Claimed Buyers approvals and renewals, where applicable.

67.     All Claimed Buyers listed in Schedule 1 are located in an approved country— meaning the country has been reviewed and approved by one or more of the Defendants through the country approval process indicated in ¶¶50 through 57 for coverage under the Policies.

68.     Accordingly, under the Policies and at all times during the coverage periods under the Policies, one or more of the Defendants, not only knew, but actively determined that (i) Exclusive Group could transact with the Claimed Buyers, (ii) how much Goods Insured Exclusive Group could sell to the Claimed Buyers, (iii) the maximum payment terms Exclusive Group could extend to the Claimed Buyers, and (iv) the total volume of business Exclusive Group could do in any given invoice period in the Claimed Buyers' approved country.

69.     On August 6, 2020, when Exclusive Group tendered its first Claim to Defendant NUFIC through the AIG Defendants, regarding Claimed Buyer, Suratel (the "Suratel Claim"). David Kim—the same adjustor that handled and processed the 2019 Claim—promptly confirmed receipt of Exclusive Group's request for indemnification. The confirmation correspondence also

copied Defendant AIG CLAIMS employees Patrick Sullivan (Patrick.Sullivan@AIG.com), Kate Meza (Kate.Meza@AIG.com), and AIGSS Trade Credit Claims (AIGSSTradeCreditClaims2@AIG.com) indicating inclusion of the AIG Defendants in the claim processing, reviewing, decision-making, and approval processes.

70.     For the Claims review period beginning on August 6, 2020 to August 31, 2020, Exclusive Group corresponded via electronic mail directly with Kim, often additional employees, agents, or representatives of one or more of Defendants were included as well, such as Sullivan and Meza.

71.     On August 25, 2020, Exclusive Group received an email from Kim indicating a coverage determination was imminent regarding the Suratel Claim:

> **From:** Kim, David@Claims
> **Sent:** Tuesday, August 25, 2020 6:00 PM
> **To:** Mary Mooney
> **Subject:** RE: [EXTERNAL] Re: New Claim Submission: Suratel Inc.
>
> Hello Mary—
>
> I expect to have our coverage reply to you soon today.  I'll be in touch.
>
>
> Regards,
>
> **David Kim**
> **AIG**
> Severity Claims Adjuster-Trade Credit & Political Risk Claims
> AIG Special Risk Claims
> 80 Pine Street, 5th Floor
> New York, NY 10005
> Tel +1 201-631-2705
> Email: david.kim3@aig.com

72.     On August 26, 2020, Exclusive Group received another email from Kim requesting information that was inadvertently missing from the initial Suratel Claim submission, confirming the contract of sale, and asking for more detail regarding Exclusive Group's debt recovery efforts against the Claimed Buyer, Suratel. That same day, Exclusive Group promptly replied and included all of the relevant information requested.

73.     On September 8, 2020, while following up with Kim regarding the status of review

from Exclusive Group's August 26, 2020 email, Exclusive Group received an automatic reply indicating that Kim would be out of the office due to family leave from Monday, August 31, 2020 until Thursday, October 26, 2020. Moreover, in the interim, "for any immediate claims inquiries or new claim submissions, you may email TCPRClaimsUS@AIG.com" or Kate Meza.

74.     In response, Exclusive Group forwarded the August 26, 2020 correspondence between it and Kim to Meza and TCPRClaimsUS@AIG.com on September 8, 2020. Meza responded that "[she] will check on the [Suratel Claim] file and get back to [Exclusive Group] with an update shortly."

75.     The following day, September 9, 2020, in response to additional documentation voluntarily provided by Exclusive Group to Meza, she again replied that "[she] will get back to [Exclusive Group] soon on the status of this claim." Kim and Sullivan were both included on this correspondence.

76.     After no response from Meza or any other employee, representative or agent of Defendants on the status of the Suratel Claim, Exclusive Group requested an update on September 21, 2020 from Meza, Kim, and Sullivan—nearly one month from Kim's communication that an indemnification decision was imminent. No one, not Meza, Kim, Sullivan, nor any other employee, agent or representative of any of the AIG Defendants would respond directly to this request.

77.     On or around September 11, 2020, Defendant AIG CLAIMS communicated via its employee, Meza, to Exclusive Group that one or more of the Defendants appointed an outside adjusting firm BBCG to assist them in the review of several of the Claims listed in **Schedule 1**. Moreover, Meza specified that Defendant BBCG "will keep AIG informed of the review as it progresses."



78.     Defendant BBCG is a Canadian-based claims adjustment firm that purportedly specializes in several areas of adjustment, including trade credit claims, across many industry sectors; however, BBCG does not claim to have any experience in the telecommunications sector. BBCG lists AIG as one of its clients. Defendant BBCG is not licensed to do business or to provide adjusting services in the State of Florida.

79.     Defendants appointed adjustor, Jeffrey Traves—a bond claim adjustor with BBCG—to Exclusive Group's trade credit telecommunications Claims handling. Traves is not licensed to provide adjusting services in the State of Florida.

80.     Exclusive Group communicated directly via email with Traves, providing timely responses, supplemental information, and additional documentation at the request of Traves and Defendant BBCG.

81.     At a minimum, Meza and Defendant AIG CLAIMS were copied on all correspondence and document transmissions between Exclusive Group and Defendant BBCG. Often additional employees, agents, or representatives of one or more of Defendants were included as well, such as Sullivan and Kim.

82.     Throughout the Claims processing period beginning on August 6, 2020 to October, 21, 2020, Exclusive Group remitted to one or more of Defendants directly or through BBCG, hundreds of pages of documentation in support of its valid insurance Claims to which Exclusive

Group received no substantive coverage response from Defendants.

83.     On October 22, 2020, Exclusive Group received a 7-page formal letter from Defendant AIG CLAIMS drafted by Meza on AIG-branded letterhead consolidating the Claims processing for all of Exclusive Group's Claims and setting forth 29 additional inquiries and requests.

84.     On November 4, 2020, Exclusive Group formally replied to Defendant AIG CLAIMS' inquiries setting forth detailed explanations and attachments totaling 160 pages.

85.     One month later, on December 4, 2020, after a phone call between AIG CLAIMS' Meza and Exclusive Group, Exclusive Group sent Defendant AIG CLAIMS, Meza, and Kim an email plea requesting expeditious processing of the Claims and the re-involvement of Kim, who has demonstrated knowledge, understanding, and experience with trade credit insurance claims in the telecommunication industry:



From: **Mary Mooney** mary.mooney@exclusivegroupholdings.com  📎
Subject: Re: Undeliverable: Re: Insured: Exclusive Group Holdings Inc./Claims filed under Policies 11184726-19 (1-Jun-19 to 1-Jun-20) and 11184726-20 (1-Jun-20 to 1-Jun-21)/ Buyers: Various (USA)
Date: December 4, 2020 at 11:21 AM
To: Meza, Kate Kate.Meza@aig.com
Cc: David Kim david.kim3@aig.com

Kate,

Thank you as well for your time yesterday afternoon and for your assistance and insight thus far. While I am grateful to continue the conversation and to answer any productive inquiry that will lead to an expeditious resolution of any and all claims, it is clear to me that we run on incongruous timelines for claim payouts that have critical implications for our business and our future.

We have debt obligations in running our business. We have furloughed our employees. Every day delayed on claim payouts forces a daily continuation of revenue loss and keeps our eager employees unpaid and out of work. These effects put us at risk on our other obligations with a possibility of causing real, irrevocable business harm not only to us, but to our hardworking service providers and lenders.

It is my request that any reply or inquiry be made expeditiously. We do not require formal memorandums of inquiry when an email exchange or conference call will suffice to convey the necessary information and get both of us answers faster.

I have copied David Kim, whom as you know, we worked with when we had a single claim in 2018. He has knowledge and understanding of our business model as we parsed through it in detail on our only other claim experience. After a 60-minute call with David and his team, we were able to address any questions and concerns promptly, which led to conclusion of the claims process quickly thereafter. We resolved the claim from start to finish in 87 days.

We request the same promptness in claims processing this go-around.  We have had some claims languishing in the review process since the beginning of August. Our basic business model remains unchanged from our first insurance event. We have provided all of the same information already with each claim submission. I am not clear what makes this review process more protracted.

We should be made acutely aware of any delays on your part as we see no reason for it.  If we need to escalate these issues within your team to expedite claims processing, please let's do so.

Stated simply, we are at a critical point in our business lifecycle, which is dependent on our collective ability to work together  to complete the claims payout process.

Best Regards,
Mary



86.     In response to Exclusive Group's plea, on December 11, 2020, Exclusive Group received a 10-page formal letter from Defendant AIG CLAIMS again drafted by Meza on AIG-branded letterhead and again consolidating the Claims processing for all of Exclusive Group's Claims under the Polices issued by Defendant NUFIC.

87.     Instead of exhibiting an understanding of Exclusive Group's hardship as a result of the delay in Claims processing, Meza responding on behalf of one or more of Defendants, put forth a series of thirty-one more requests for information that were (i) duplicative of information already provided by Exclusive Group, (ii) requested information already known to Defendants through the underwriting process, Buyer approval process, or country approval process, (iii) were unreasonable questions that request information that reaches outside of the requirements of the

Policies, or (iv) reflected a complete lack of fundamental knowledge of the wholesale telecommunications industry. Moreover, Meza removed Kim—who has a history of handling telecommunications trade credit claims—from the transmission of her response to Exclusive Group.

88.     As an example, Meza asks in her December 11, 2020 letter, "on what physical telecommunication network(s) did these long-distance minutes, *i.e., calls,* exist when they were 'shipped' to Exclusive Group's [B]uyers under the claimed transactions?"  This demonstrates that Defendant AIG CLAIMS has no concept of what VoIP is and how it operates.  She further asks, "What documents other than the CDRs does Exclusive Group use to verify that it has supplied the minutes to it [B]uyer and that [B]uyer uses to verify that it received the minutes purchased?"  Again, Defendant AIG CLAIMS requested documents that do not exist in the VoIP industry and again, demonstrates lack of fundamental knowledge of the industry for which Defendant NUFIC insured Exclusive Group.

89.      Defendants had knowledge of Exclusive Group's wholesale telecommunications business model and were engaged in the day-to-day approvals of Exclusive Group's Buyers and the Buyer's Country as described *infra.* at ¶¶46 through 57. However, once Exclusive Group asserted valid Claims under the Policies, Defendants began questioning the validity of their previously approved Buyers and Buyers' country transactions, notwithstanding the fact that the approved Buyers had established telecom transaction and payment histories with Exclusive Group. Defendants' actions were done with the sole purpose to rationalize Defendants' unlawful denial and payment of Exclusive Group's Claims.

90.     On December 17, 2020, Meza introduced John Timmerberg "from NUFIC's investigations group" into the Claims handling process. Timmerberg identifies himself as a

Principal Investigator in AIG's Global Investigative Services Division and communicates using the AIG-branded email address, John.Timmerberg@AIG.com, indicating Timmerberg is an agent, representative, or employee of one of the AIG Defendants.  It is unclear from Timmerberg's introduction whether he has any knowledge, understanding, or experience with the wholesale telecommunications industry that will support Defendants' understanding and handling of Exclusive Group's trade credit Claims.

91.     On December 21, 2020, Exclusive Group participated in a telephone conference call with agents, employees or representatives of one or more of Defendants led by Meza, who indicated the call was being recorded. This call did not yield any resolution to Exclusive Group's Claims nor create clarity on what specifically Defendants need to expeditiously indemnify Exclusive Group for each of its individual Claims. Rather, Defendants continued to address Exclusive Group's Claims with broad strokes—refusing to acknowledge Claims-specific information—and request information outside of what is required in the Policies.

92.     Frustrated with the lack of progress on any of Exclusive Group's Claims, Exclusive Group sought to get approval on one Claim in an attempt to (i) narrow down the burdensome requests continually made by Defendants, (ii) refocus the Claims handling process on information already submitted and as applied to the Policies, and (iii) create a roadmap that both Exclusive Group and Defendants could use as the foundation to go forward with the remaining Claims handling.

93.     Accordingly, on January 19, 2021, Exclusive Group sent a formal letter to Meza, Timmerberg, AIG CLAIMS, and one or more of Defendants regarding the Suratel Claim—the claim that nearly five months earlier Defendants stated that a coverage determination was imminent.

94.     On February 5, 2021, Exclusive Group received a 7-page formal letter from Defendant AIG CLAIMS again drafted by Meza on AIG-branded letterhead and again consolidating the Claims processing for all of Exclusive Group's Claims whereby Defendants refused to individually address the Suratel Claim and thus ignored Exclusive Group's January 19, 2021 letter altogether. Instead, Defendants again requested information and responses from Exclusive Group that fall outside the requirements of the Policies. As an example, Defendants even go so far as to ask Exclusive Group to examine and provide an opinion as to the validity of opinions contained in court documents filed in a Canadian jurisdiction.

95.     On May 28, 2021, Defendant NUFIC, in concert with Defendants, through its attorneys, communicated a blanket denial of all of the Claims set forth in **Schedule 1** falsely protesting that each of the pre-approved, Claimed Buyers is somehow illegitimate, falsely maintaining that all the documents Exclusive Group provided during the underwriting and claims process are now somehow forgeries, falsely recasting Exclusive Group's business model, falsely asserting that none of Exclusive Group's payments from its Customer constitute actual proof of payment, and attacking Exclusive Group's business practices—overtly stating "the pre-screening efforts that Exclusive Group actually conducted were ineffective at both identifying [alleged] misconduct among its counterparties and satisfying [Exclusive Group's] prophylactic risk mitigation and disclosure obligations under the Policies."

96.     To be sure, Defendant NUFIC's denial ignores that (i) at all times under the Policies and thereafter Exclusive Group was acting in good faith in its valid requests for indemnification under the Claims,  (ii) each of the Claimed Buyers were hand-vetted and approved by Defendant AIG through the Uniform Resource Locator and a senior underwriter, Jasmina Vigil, (iii) Defendants had or had access to all of the same Buyer documentation that Exclusive Group relied

on at the time of underwriting and approving each of the Claimed Buyers, (iv) Exclusive Group's pre-screening efforts were predicated on NUFIC's and the AIG Defendants' own requirements for buyer approvals and country approvals as outlined in the Policies, and (v) under the Policies, Defendants, not only knew, but actively dictated what countries Exclusive Group could transact in, which Buyers Exclusive Group could transact with within those countries, how much Exclusive Group could sell to those Buyers, the timeframe under which Exclusive Group's Buyers had to pay invoices, and in the event of a Buyer nonpayment, the length of time Exclusive Group had to wait before it could seek indemnification and payment from NUFIC.

97.     Simply stated, Defendants NUFIC and the AIG Defendants cherry picked certain Buyers that they now say no longer exist for Defendants to use to justify the denial of Exclusive Group's Claims even though Defendants had pre-approved those precise Buyers.

## **EXCLUSIVE REJECTS AND DOES NOT AGREE TO ARBITRATION**

98.     On April 9, 2021, Exclusive Group sent correspondence to Defendant NUFIC giving notice of Exclusive Group's potential plan to invoke a provision in the insurance policy to resolve the dispute over the Suratel Claims: "[Exclusive Group] intends to exercise and invoke the Arbitration Provision contained in IX. SECTION VI., GENERAL CONDITIONS, paragraph C of the policy." The letter was issued prior to any formal denial of the Claims by either NUFIC or Defendants.

99.     The identified provision provides Exclusive Group with the right to file a lawsuit in a federal or Florida court, unless "both parties must be in agreement to voluntarily enter into arbitration and to mutually agree to make it binding at the time of the dispute."

100.     Both parties were not in agreement to voluntarily enter into arbitration nor to mutually agree to make it binding at the time of the dispute for the Suratel Claim.  Nor were both

parties in agreement for any of the other Claims.

101.    The insurance Policies issued by Defendant NUFIC do not mandate arbitration. Thus, Exclusive Group's claims in this Court are proper and not the subject of arbitration.

## COUNT I: BREACH OF CONTRACT AGAINST NUFIC

102.    Exclusive Group re-alleges ¶¶ 1 through 101 above, as if fully set forth herein.

103.    Concerning the Claims referenced in **Schedule 1**, NUFIC has a duty under the Policies and Florida law to provide the coverage afforded by the Policies, including but not limited to, to recognize and to pay the Claims and benefits under the Policies to Exclusive Group.

104.    Exclusive Group submitted the Claims listed in **Schedule 1** to NUFIC for coverage and indemnity.

105.    NUFIC breached its obligations under the Policies to Exclusive Group against whom the Claims in **Schedule 1** have been made by failing to recognize all conditions precedent to the Claims have been performed or waived and failing to pay the Claims as agreed under the terms of the Policies.

106.    NUFIC, to whom the Claims listed in Schedule 1 have been made, caused Exclusive Group damages, including but not limited to, the costs Exclusive Group incurred in defending its presentation of the Claims to NUFIC, by NUFIC failing to promptly pay the Claims, pre-judgment interest on any Claims payments not made, and/or consequential damages based on NUFIC and the other Defendants' breach of the duty to promptly resolve the Claims made under the Policies.

107.    Exclusive Group has retained the undersigned counsel to pursue these actions against NUFIC.  Exclusive Group has been harmed by becoming obligated to pay undersigned counsel's attorney's fees to enforce its rights under the Policies and for all costs associated with

the subject action. NUFIC is therefore obligated to pay the Claims and Exclusive Group's attorney's fees under Fla. Stat. § 627.428.

WHEREFORE, Exclusive Group requests judgment for breach of contract against Defendant NUFIC, as well as an award of all costs, pre- and post-judgment interest, and attorney's fees under Fla. Stat. § 627.428.

## COUNT II: TORTIOUS INTERFERENCE AGAINST BBCG, AIG CLAIMS, AND AIG

108.    Exclusive Group re-alleges ¶¶ 1 through 101 above, as if fully set forth herein.

109.    On information and belief, Jasmina Vigil and Kate Meza are employees, agents, or representatives of AIG CLAIMS and AIG, have control over the policy language and/or AIG CLAIMS and AIG were involved in the underwriting, Buyer approval process, country approval process, servicing, investigating, handling, processing, and denying the Claims.

110.    On information and belief, Jeffrey Traves is an employee, agent, or representative of BBCG and/or BBCG was involved in the servicing, investigating, handling, processing, and denying the claims.

111.    BBCG and the AIG Defendants did not have contractual privity with Exclusive Group regarding the Claims.

112.    Exclusive Group had a business relationship with NUFIC such that NUFIC was obligated to pay the Claims.

113.    BBCG and the AIG Defendants had knowledge of that business relationship.

114.    BBCG and the AIG Defendants had an intentional and unjustified interference with that relationship by improperly causing NUFIC to deny the claims. For example, AIG CLAIMS via its employee, Meza, interjected itself into the claims process and appointed third parties, like Defendant BBCG, to assist in adjusting Exclusive Group's Claims. On information and belief,

Meza and others are employees, agents, or representatives of one of the AIG Defendants and BBCG, and based upon their actions or omissions, wrongfully exerted control over the NUFIC Policy language. As a result, BBCG and the AIG Defendants improperly serviced, investigated, handled, and processed Exclusive Group's Claims, ultimately resulting in BBCG and the AIG Defendants causing the wrongful denial of Exclusive Group's Claims and resulting in NUFIC's refusal to pay Exclusive Group.

115.    BBCG and the AIG Defendants' interference caused damage to Exclusive Group.

116.    BBCG and the AIG Defendants engaged in tortious interference with Exclusive Group's ability to obtain payment for the Claims.

117.    WHEREFORE, Exclusive Group requests judgment for tortious interference against BBCG and the AIG Defendants, as well as an award of damages, punitive damages, all costs, pre- and post-judgment interest.

## COUNT III: NEGLIGENCE AGAINST BBCG, AIG CLAIMS, AND AIG

118.    Exclusive Group re-alleges ¶¶ 1 through 101 above, as if fully set forth herein.

119.    This count is pled in the alternative to Count II above.

120.    On information and belief, Jasmina Vigil and Kate Meza are employees, agents, or representatives of AIG CLAIMS and AIG, have control over the policy language and/or AIG CLAIMS and AIG were involved in the underwriting, Buyer approval process, country approval process, servicing, investigating, handling, processing, and denying the Claims.

121.    On information and belief, Jeffrey Traves is an employee, agent, or representative of BBCG and/or BBCG was involved in the servicing, investigating, handling, processing, and denying the claims.

122.    BBCG and the AIG Defendants did not have contractual privity with Exclusive

Group regarding the Claims.

123.    Exclusive Group had a business relationship with NUFIC such that NUFIC was obligated to pay the Claims.

124.    BBCG and the AIG Defendants had knowledge of that business relationship.

125.    BBCG and the AIG Defendants had a duty to not interfere with that relationship.

126.    BBCG and the AIG Defendants breached that duty by improperly causing NUFIC to deny the claims.  For example, AIG CLAIMS via its employee, Meza, interjected itself into the claims process and appointed third parties, like Defendant BBCG, to assist in adjusting Exclusive Group's Claims.   On information and belief, Ms. Meza and others are employees, agents, or representatives of one of the AIG Defendants and BBCG, and based upon their actions or omissions, wrongfully exerted control over the NUFIC Policy language. BBCG and the AIG Defendants improperly serviced, investigated, handled, and processed Exclusive Group's Claims, ultimately resulting in BBCG and the AIG Defendants causing the wrongful denial of Exclusive Group's Claims.

127.    BBCG and the AIG Defendants' breach of their duty caused damage to Exclusive Group.

128.    BBCG and the AIG Defendants negligently interfered with Exclusive Group's ability to obtain payment for the Claims.

129.    WHEREFORE, Exclusive Group requests judgment for negligence against BBCG and the AIG Defendants, as well as an award of damages, all costs, pre- and post-judgment interest.

## **DEMAND FOR JURY TRIAL**

Exclusive Group demands trial by jury on all issues triable as of right by jury.

Dated: _____, 2022,

CULLIN O'BRIEN LAW, P.A.
6541 NE 21st Way
Ft. Lauderdale, FL 33308
Telephone: (561) 676-6370
Fax: (561) 320-0285

*/s/ Cullin O'Brien*_____
CULLIN O'BRIEN
Florida Bar No. 0597341
cullin@cullinobrienlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 24, 2022, I electronically filed the foregoing document with the Clerk of the Court using the ECF system.

*s/ Cullin A. O'Brien*_____
CULLIN A. O'BRIEN

# SCHEDULE 1

**Schedule 1**

The following Claims with the Claimed Buyers have been made against one or more of the Policies as indicated:

a) Suratel, Inc. ("Suratel")

   Claim No.: 344-003172-001
   Date of Claim/Proof of Loss Form: August 5, 2020
   Buyer Approved: August 2, 2019
   Approved Country: USA
   Policy No.: 11184726-19 (June 1, 2019 – June 1, 2020)
   Amount of Claim: $151,007.49

b) Voister Telecom Inc. ("Voister")

   Claim No.: 344-003172-002
   Date of Claim/Proof of Loss Form: September 8, 2020
   Buyer Approved: September 11, 2019
   Approved Country: USA
   Policy No.: 11184726-19 (June 1, 2019 – June 1, 2020)
   Amount of Claim: $502,080.40

c) Phone Works Inc. ("Phone Works")

   Claim No.: 344-003188-001
   Date of Claim/Proof of Loss Form: September 9, 2020
   Buyer Approved: September 5, 2019; Approval Renewed June 1, 2020
   Approved Country: USA
   Policy No.: 11184726-20 (June 1, 2020 – June 1, 2021)
   Amount of Claim: $291,298.84

d) IDN Telecom Inc. ("IDN")

   Claim No.: 344-003172-003
   Date of Claim/Proof of Loss Form: September 25, 2020
   Buyer Approved: May 15, 2019; Approval Renewed June 1, 2020
   Approved Country: USA
   Policy No.: 11184726-19 (June 1, 2019 – June 1, 2020)
   Amount of Claim: $29.00

   Claim No.: 344-003188-002
   Date of Claim/Proof of Loss Form: September 25, 2020
   Buyer Approved: May 15, 2019; Approval Renewed June 1, 2020
   Approved Country: USA
   Policy No.: 11184726-20 (June 1, 2020 – June 1, 2021)
   Amount of Claim: $618,400.82

e)   Telco Enterprise, Inc. ("Telco Enterprise")

Claim No.: 344-003172-004
Date of Claim/Proof of Loss Form: September 30, 2020
Buyer Approved: September 11, 2019; Approval Renewed June 1, 2020
Approved Country: USA
Policy No.: 11184726-19 (June 1, 2019 – June 1, 2020)
Amount of Claim: $90,877.20

Claim No.: 344-003188-003
Date of Claim/Proof of Loss Form: September 30, 2020
Buyer Approved: September 11, 2019; Approval Renewed June 1, 2020
Approved Country: USA
Policy No.: 11184726-20 (June 1, 2020 – June 1, 2021)
Amount of Claim: $17,083.10

f)   Communications Server Services, Inc. ("CSS")

Claim No.: 344-003196-001
Date of Claim/ Proof of Loss Form: September 30, 2020
Buyer Approved: June 1, 2019; Renewed June 1, 2020
Approved Country: USA
Policy No.: 11184726-20 (June 1, 2020 – June 1, 2021)
Amount of Claim: $155,140.60

g)   Jerris Voip Solutions LLC ("JVS")

Claim No: 344-003200-001
Date of Claim/Proof of Loss Form: October 6, 2020
Buyer Approved: September 23, 2019; Renewed June 1, 2020
Approved Country: USA
Policy No.: 11184726-20 (June 1, 2020 – June 1, 2021)
Amount of Claim: $312,251.53

h)   Telco Circuits Inc. ("Telco Circuits")

Claim No.: 344-003188-004
Date of Claim/Proof of Loss Form: October 6, 2020
Buyer Approved: June 1, 2019; Renewed June 1, 2020
Approved Country: USA
Policy No.: 11184726-20 (June 1, 2020 – June 1, 2021)
Amount of Claim: $511,562.59

i)   Voicebee LLC ("Voicebee")

Claim No.: 344-003188-008
Date of Claim/ Proof of Loss Form: October 7, 2020
Buyer Approved: June 1, 2019; Renewed June 1, 2020

34

Approved Country: USA
Policy No.: 11184726-20 (June 1, 2020 – June 1, 2021)
Amount of Claim: $205,509.39

j)   Telco Solutions LLC ("Telco Solutions")

Claim No.: 344-003202-001
Date of Claim/Proof of Loss Form: October 7, 2020
Buyer Approved: June 1, 2019; Renewed June 1, 2020
Approved Country: USA
Policy No.: 11184726-20 (June 1, 2020 – June 1, 2021)
Amount of Claim: $512,105.31

k)   TelcoMax LLC ("TelcoMax")

Claim No.: 344-003188-007
Date of Claim/Proof of Loss Form: October 7, 2020
Buyer Approved: June 1, 2019; Renewed June 1, 2020
Approved Country: USA
Policy No.: 11184726-20 (June 1, 2020 – June 1, 2021)
Amount of Claim: $510,357.14

l)   Multi-Telco LLC ("Multi-Telco")

Claim No.: 344-003201-001
Date of Claim/Proof of Loss Form: October 7, 2020
Buyer Approved: September 11, 2019; Renewed June 1, 2020
Approved Country: USA
Policy No.: 11184726-20 (June 1, 2020 – June 1, 2021)
Amount of Claim: $156,422.07

m)   Comdata Partners Corp.("Comdata")

Claim No.: 344-003188-006
Date of Claim/Proof of Loss Form: October 7, 2020
Buyer Approved: September 10, 2019; Renewed June 1, 2020
Approved Country: USA
Policy No.: 11184726-20 (June 1, 2020 – June 1, 2021)
Amount of Claim: $360,075.00

n)   Communications and Consulting Services LLC ("CCS")

Claim No.: 344-003188-005
Date of Claim/Proof of Loss Form: October 7, 2020
Buyer Approved: September 4, 2019; Renewed June 1, 2020
Approved Country: USA
Policy No.: 11184726-20 (June 1, 2020 – June 1, 2021)
Amount of Claim: $512,811.45

# EXHIBIT A



## Reciprocal Telecommunications Service Agreement

This Reciprocal Telecommunications Service Agreement (this "Agreement") is made as of _____, 20___ (the "Effective Date"), by and between Exclusive Group Holdings Inc., ("Exclusive Group"), and _____, ("Company").

**WHEREAS,** Exclusive Group and Company are providers of international telecommunications Services; and

**WHEREAS,** Exclusive Group desires to procure certain telecommunications Services provided by Company and Company desires to procure certain telecommunications Services provided by Exclusive Group.

**NOW, THEREFORE,** in consideration of the mutual covenants and Agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

**DEFINITIONS:**

"Effective Date" shall mean the date of execution of this Agreement.

"Service" or "Services" shall mean those telecommunication Services described in the attached Schedule of Annexes incorporated herein by reference.

"Service Date" shall mean the date of completion of provisioning and testing of Service(s), and each Party shall notify the other Party of the respective Service Date of Services it is providing hereunder.

"Customer" shall mean the Party purchasing Service(s).

"Provider" shall mean the Party of the Agreement who is providing the Service/termination to the Customer.

1.   **SERVICE**

The Parties, directly or through their affiliates or underlying carriers, shall provide, procure, and utilize the Services per the terms and conditions of this Agreement.

2.   **TERM**

This Agreement shall commence on the Effective Date and shall continue to be in full force and effect unless and until terminated in accordance with the terms hereof.  The Parties may terminate this Agreement, and/or terminate or suspend any Service provided to Customer under it, at any time without liability upon thirty (30) days prior written notice.  The Parties may terminate this Agreement without liability on three (3) days prior written notice to Customer for any breach of this Agreement including, but not limited to, a failure by Customer to pay in a timely manner any charges for Services rendered.  In addition, either Party may terminate this Agreement immediately without notice or liability in the event that either Party deems such actions necessary due to Customer's use of the Services for unlawful purposes or in an unlawful manner, or in order to protect or preserve either Party's network.  In the event of any



termination of this Agreement each Party shall pay the other Party for all Service rendered through and including the date of termination.

**3.   CONNECTIONS**

Where applicable, each Party shall be responsible to connect to the other Party's network at one of the other Party's network interconnection locations, and the Parties shall be responsible to procure, at their own expense, the necessary facilities or equipment required to interconnect to such locations.  The Parties shall endeavor to provide the Services on the Service Date and they shall be solely responsible to coordinate the provisioning of their respective matching facilities and/or equipment (where applicable) by the Service Date.  The Parties shall coordinate the management of their respective network facilities.   The Parties also shall interface on a 24 hours/7 days a week basis to assist each other with the isolation and repair of any facility faults in their respective networks.

**4.   RATES**

During the term of this Agreement, Exclusive Group shall charge for the telecommunication Services, and Company shall pay for such telecommunication Services, the amount determined by using the rates set forth in *Annex A.*

During the term of this Agreement, Company shall charge for the telecommunication Services, and Exclusive Group shall pay for such telecommunication Services, the amount determined by using the rates set forth in *Annex B.*

Exclusive Group shall have the right to modify the rates and conditions set forth in Annex "A" at any time, but shall give the other Party at least five (5) days prior written notice.

Company shall have the right to modify the rates and conditions set forth in Annex "B" at any time, but shall give the other Party at least five (5) days prior written notice.

**5.   SECURITY**

As a condition of the Parties obligations hereunder, and to ensure the prompt payment of sums due from Customer, Customer may be requested by the other Party to furnish upon the execution of this Agreement either a cash deposit in an amount satisfactory to the Provider, or an irrevocable and unconditional letter of credit in an amount satisfactory to the Provider.  The Provider shall have the right to require Customer to increase the amount or institute a requirement for a cash deposit, letter of credit, or other security whenever it deems such increase to be necessary.  Customer shall provide such increased security to the Provider within three (3) days of request.

**6.   PAYMENT TERMS**

**Standard Terms:** The Parties hereby acknowledge that charges for the Services shall be billed on a Weekly basis; every seven (7) days and that payment for such Services is due and payable in US dollars one (1) day from the receipt of the invoice.  Payments received prior to 7 pm GMT Monday-Friday will be processed for payment the same day. Payments received after 7 pm GMT Monday-Friday will be processed for payment the following business day. Further, payments received after 7 pm GMT Monday-Friday are deemed late and will be subject to late fees. Each billing period will begin Monday 00:00 GMT and end Sunday 23:59:59 GMT.



**Late Payments:**  Late payments shall be assessed a late charge of 1.0% per day calculated on the outstanding balance owed, or the maximum amount permitted by law, whichever is less. Late fees will capitalize into the past due principal balance each billing period.

**Transfer Fees:**  The Parties are responsible for their own bank and transfer fees associated with payments.

**Banking Information:** For Services provided by Exclusive Group; Company can wire transfer payments to the attached wire instruction document.

For Services provided by Company; Exclusive Group can wire transfer payments to:

**[Please Provide]**

## 7.  TAXES

The Parties acknowledge and understand that all charges stated in the attached Annexes are computed exclusive of any applicable use, excise, gross receipts, sales and privilege taxes, duties, fees, or other taxes or similar liabilities (other than general income or property taxes). Such Additional Charges shall be paid by the Customer in addition to all other charges provided herein.

## 8.  DISPUTES

Should either Party dispute any of the charges on the invoice, it shall notify the other Party of the disputed charges not later than seven (7) days from the date of invoice.  Said dispute shall be set forth in a writing containing all details concerning the disputed charges.

In the event of a dispute; the entire invoice shall be paid in accordance with the payment terms set forth herein.  Disputes shall be reviewed and resolved within fifteen (15) days of receipt of written dispute.  However, the Provider shall have no obligation to review disputed charges until the disputed invoice is paid in full.  In the event such dispute is resolved in favor of Customer, Provider shall provide Customer with a credit against future billing in the amount of the disputed billing.  In the event that Customer fails to pay an invoice in full because of a billing dispute, Provider shall have the right, after giving Customer five (5) days prior written notice, to suspend all or any portion of the Services until such time as the dispute is resolved or to require Customer to provide additional security deposit.

## 9.   WARRANTY

The Parties shall use reasonable efforts under the circumstances to maintain overall network quality.  The quality of Service provided hereunder shall be consistent with other common carrier industry standards, government regulations and sound business practices.

THE PARTIES MAKE NO OTHER WARRANTIES ABOUT THE SERVICE PROVIDED HEREUNDER, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO ANY WARRANTY OF MARKETABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE.

## 10.  FRAUDULENT CALLS

The Provider shall not be responsible or liable for any interruption, diminution, or failure of service, in whole or in part, and in no event shall the Provider be responsible or liable for any incidental or consequential damages incurred by Customer or any user of Customer's service.



The Customer shall indemnify and hold the Provider harmless from and against all costs, expenses, losses, damages, claims and actions of any kind arising from or related to fraudulent calls of any nature which may comprise a portion of the Service to the extent that the Party claiming the call(s) in question to be fraudulent is (or was at the time of the call) a Customer or end-user of the Service.  Customer shall not be excused from paying the Provider for Service provided to Customer, or any portion thereof, on the basis that fraudulent calls comprised a corresponding portion of the Service.

## 11.  <u>LIMITATION OF LIABILITY</u>

IN NO EVENT SHALL EITHER PARTY HERETO BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL LOSSES OR DAMAGES, INCLUDING WITHOUT LIMITATION, LOSS OF REVENUE, LOSS OF CLIENTS, LOSS OF GOODWILL OR LOSS OF PROFITS ARISING IN ANY MANNER FROM THIS AGREEMENT AND THE PERFORMANCE OR NONPERFORMANCE OF OBLIGATION HEREUNDER.

## 12.  <u>FORCE MAJURE</u>

No failure or omission by either Party to carry out or observe any of the terms and conditions of this Agreement, other than any payment obligation shall give rise to any claim against such Party or be deemed a breach of this Agreement if such failure or omission arises from an act of God, and act or omission of Government, insurrection of civil disorder, war or military operations, national or local emergency, acts or omissions of Government, highway authority or other competent authority, industrial disputes of any kind (whether or not involving the Party's employees), fire, lighting, explosion, flood, subsidence, inclement weather, acts or omissions of persons or bodies for whom the Party is not responsible or any other cause whether similar or dissimilar outside such Party's control

## 13.  <u>PROPRIETARY INFORMATION AND CONFIDENTIALITY</u>

Shall commence on the Effective Date and shall terminate either: (A) two (2) years immediately following the termination of this Agreement, or (B) two (2) years after the termination or expiration of any other Agreement between the Parties, whichever occurs later.  Notwithstanding such expiration or termination, confidentiality pursuant to this Agreement shall survive with respect to any Proprietary Information received prior to such expiration or termination for as long as the Proprietary Information remains confidential.

## 14.  <u>SEVERABILITY</u>

If any provision, subsection or sentence contained in this Agreement is found to be unenforceable in any respect, such unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such enforceable provision had never been contained herein.

## 15.  <u>NO AGENCY</u>

Neither Party is authorized to act as an agent for, or legal representative of, the other Party and neither Party shall have the authority to assume or create any obligation on behalf of,  in the name of, or binding upon the other Party.  Customer shall not represent or intimate that Provider is responsible for the type or quality of Customer's services to a third party customer.

## 16.  <u>SUSPENSION OF SERVICES</u>

In the event payment in full is not received from either Party when due, the other Party shall have the right, after giving the defaulting Party one (1) day prior written notice, to suspend all



or any portion of the Service to the defaulting Party until such time as such Party has paid in full all charges then due, including any late fees.

**17.** **BINDING AGREEMENT**

This Agreement and the Parties' described obligations shall be binding on the representatives, assigns and successors of the Parties and shall inure to the benefit of the assigns and the successors of the Parties.

**18.** **AMENDMENTS**

This Agreement may not be modified, except by a written document signed by authorized officers of the Parties hereto.

**19.** **NOTICES**

All notices, requests or other communications hereunder shall be in writing, addressed to the Parties at the address indicated in this Agreement or as otherwise stated in the relevant Annex hereto in respect of any particular Service.  Notices mailed by registered or certified mail shall be deemed to have been received by the addressee on the fifth business day following the mailing or sending thereof. Notices sent by facsimile shall be deemed to have received when the delivery confirmation is received.  Notices sent by electronic mail shall be deemed to have been received one (1) day after the electronic mail was sent. Any notices of change of address shall be deemed to have been received only when actually received.

**20.** **NO-WAIVER**

The failure to enforce or to require the performance at any time of any of the provisions of this Agreement shall not be construed to be a waiver of any other provision and shall not affect either the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every provision of this Agreement.

**21.** **HEADINGS**

The headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

**22.** **CHOICE OF LAW**

This Agreement and its attachments, are governed by and shall be construed in accordance with Florida Law.  Both Parties submit to the exclusive jurisdiction of the courts of Collier County, Florida.

**23.** **ENTIRE AGREEMENT**

This Agreement and the Schedules attached hereto set forth the full Agreement of the Parties with respect to the subject matter hereof, and supersede any prior Agreement or understanding.

IN WITNESS WHEREOF, each of the Parties have executed this Agreement in duplicate, or caused this Agreement to be executed in duplicate by a duly authorized officer, as of the effective date above written.

**Exclusive Group Holdings Inc.**          **Customer Name**



**Principal Address:**
780 Fifth Avenue South
Suite 200
Naples, FL 34102
**Tel: +1 (239) 261-5500**

**Date:**

**Principal Address:**

**Tel: +**

**Date:**

Authorized Signature
**Mark Weir, VP Sales**

Authorized Signature

Name and Title

# EXHIBIT B



*• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •*

## NON BINDING INDICATION

| TO: | FROM: |
|---|---|
| Jay Tenney | Jasmina Vigil |
| COMPANY: | DATE: |
| Trade Risk Group | May 17, 2019 |
| PHONE NUMBER: | PHONE NUMBER: |
| 214-496-9905 | 713.342.7463 |

## <u>Non Binding Indication – Exclusive Group Holdings Inc.</u>

We are pleased to offer a preliminary non-binding indication for the captioned submission. Pl note that final terms and conditions can only be quoted after our review of any requ documentation (*see Required Information section*). The terms and conditions offered below expire thirty (30) days following the date of this memorandum, unless withdrawn earlier.

| AIG Trade Credit Policy Features |
|---|
| • Buyer Limits of Liability and Country Limits of Liability are ***Non-cancelable*** for a full policy term |
| • Online access to your policy via ***AIG Global Limits*** to track existing credit limits and request additional coverage |
| • Optional preferential collection agency rates through a global, third-party service provider - ***STA International*** |



*• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •*

| | |
|---|---|
| Insured: | Exclusive Group Holdings, Inc.<br>780 5th Avenue South , Suite 200<br>Naples FL 34102 |
| Broker: | Trade Risk Group<br>751 Plaza Blvd.<br>Coppell, TX 75019 |
| Loss Payee: | Arete Global, LLC<br>2117 Modena Ct.<br>Naples, FL 34105<br>Ph: 239-877-7557 |
| Coverage: | Domestic Export Credit Insurance |
| Issuing Company: | National Union Fire Insurance Company of Pittsburgh, PA |
| Period: | From June 1, 2019 to June 1, 2020 |
| Policy Limit of Liability: | $2,000,000 |
| Discretionary Credit Limit: | $0 |
| Annual Aggregate Deductible: | $0 |
| Non Qualifying Loss: | $5,000 |
| **Minimum and Deposit:** | **$90,000 –$45,000 due up-front and $45,000 due on July 31, 2019** |
| Portion of Premium Attributable to TRIA[1]: | 1% of premium associated with domestic sales |
| Adjustment Rate: | 0.07% |
| Insured Percentage: | 90% |
| Maximum Payment Terms: | 15 days |
| Goods Insured: | Long distance minutes and data minutes |
| Policy Currency: | US Dollars |
| Broker Commission: | 15% |
| Cease Shipment/Funding: | 60 days past due |
| Buyer Limit Cancelability | Buyer limits are non-cancelable |
| Buyer Limit Fees: | $1,000 flat fee due at policy inception. |

[1]Terrorism Risk Insurance Act of 2002.



• *2929 Allen Parkway PL 12* •   *Houston TX 77019* • *Tel: (713)-342-7463* •

Minimum and Deposit Premium: Minimum and Deposit Premium is an up-front premium amount, payable and fully earned at policy inception.

Reporting:  Each quarter the Insured shall report the Gross Invoice Value of Eligible Shipments made during the preceding quarter of the annual Policy Period and an aging report.

Quarterly Adjustment Premium - Shipments Basis: The Adjustment Rate indicated above shall be applied to the cumulative sum of each shipment report. If the calculated Adjustment Premium is greater than the Minimum and Deposit Premium, the balance shall be payable within 15 days of the date of invoice.

Additional Excluded Sales

- Sales made on terms of Confirmed or Unconfirmed Irrevocable Letter of Credit.
- Sales made on terms of Cash in Advance or Cash on Delivery.
- Sales made to subsidiary or associated companies of the Insured.
- Sales made to any Buyer that, at policy inception, is Insolvent or greater than **60** days past due.

## POLICYHOLDER DISCLOSURE
## NOTICE OF TERRORISM INSURANCE COVERAGE
### (COVERAGE INCLUDED)

Coverage for acts of terrorism is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed.  As defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for acts of terrorism is 1%, and does not include any charges for the portion of losses covered by the United States government under the Act.

Page 3 of 6



**• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •**

**Approved Buyers:**

| BUYER | DUNS | Country | Requested Limit Amount (USD) | Approved Limit Amount (USD) | Special Conditions |
|---|---|---|---|---|---|
| 1 Force Communications, LLC | 194469230 | USA | 800,000 | 800,000 | This buyer limit will expire July 1, 2019. Please provide financials to consider further extension. |
| Gold Line Telemanagement Inc | 253334809 | Canada | 300,000 | 300,000 | |
| **IDN Telecom, Inc.** | **829103050** | **USA** | **800,000** | **800,000** | |
| INTERNET MOBILE COMMUNICATIONS LIMITED | 218278916 | UNITED KINGDOM | 500,000 | 500,000 | |
| LDI Networks Inc. | 079772371 | USA | 500,000 | 500,000 | This buyer limit will expire August 1, 2019. Please provide financials to consider further extension. |
| Nustar Communications, Inc. | 601846053 | USA | 500,000 | 500,000 | |
| Red Phone Consulting LLC | 782291095 | USA | 500,000 | 500,000 | |
| SolidTelecoms, LLC | 081235028 | USA | 500,000 | 500,000 | This buyer limit will expire July 15, 2019. Please provide financials to consider further extension.. |
| SPLENDID TELECOM (PVT.) LIMITED | 645790648 | Pakistan | 250,000 | 250,000 | |
| TALK TODAY LIMITED | 663607696 | Hong Kong | 1,000,000 | 1,000,000 | This buyer limit will expire July 15, 2019. Please provide financials to consider further extension. |
| Tel-Pal Comm Inc | 203881693 | Canada | 40,000 | 40,000 | |
| TELCOM TRADER LIMITED | 534410406 | Malaysia | 500,000 | 500,000 | This buyer limit will expire July 15, 2019. Please provide financials to consider further extension. |
| TELITEC CONNECTIONS SL | 476425637 | Spain | 200,000 | 200,000 | This buyer limit will expire July 15, 2019. Please provide financials to consider further extension. |
| **Telco Circuits, Inc.** | **010104608** | **USA** | **500,000** | **500,000** | |
| **TELCO SOLUTIONS LLC** | **012457084** | **USA** | **500,000** | **500,000** | |



*• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •*

| | | | | | |
|---|---|---|---|---|---|
| UPI Telecom, Inc. | 184764769 | USA | 800,000 | 800,000 | This buyer limit will expire July 1, 2019. Please provide financials to consider further extension. |
| Voice Tel Canada Inc. | 203410956 | Canada | 100,000 | 100,000 | |
| Wagner Telecommunications, Inc. | 018299243 | USA | 500,000 | 500,000 | |

Page 5 of 6



*• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •*

**Approved Country List:**

| Country | USD Country Limit of Liability | Waiting Period In Days |
|---|---|---|
| CANADA | 1,000,000 | 90 Days, None for Insolvency |
| HONG KONG | 1,000,000 | 180 |
| MALAYSIA | 400,000 | 180 |
| PAKISTAN | 250,000 | 270 |
| SPAIN | 200,000 | 180 |
| UNITED KINGDOM | 2,000,000 | 120 |
| USA | 2,000,000 | 90 Days, None for Insolvency |

**Additional Requirements:**

- Please provide financials on Exclusive Group

Sincerely,

Senior underwriter –Trade credit



Trade Risk Group
a dba of Acrisure, LLC.
305 Floral Vale Blvd.
Yardley, PA 19067
(P) 215-860-1900
trgadmin@traderiskgroup.com

**Credit Insurance Quotation Acceptance**

Please see the attached, non-binding Quotation and Buyer Coverage List for:

| | |
|---|---|
| Insured: | Exclusive Group Holdings, Inc |
| Address: | 780 5th Avenue South, Suite 200 |
| City, State, Zip: | Naples, FL 34102 |
| | |
| Underwriter: | AIG |
| AM Best / S&P / Moody's / Fitch Ratings | A / A+ / A2 / A |
| Quote Date: | May 17, 2019 |
| Buyer Coverage List Date: | May 17, 2019 |

Please review the offer and call me with any questions or concerns.

To formally accept the attached Quotation and the terms, conditions, and provisions set forth in the policy, please:
- Sign, Date, indicate Effective Date of Coverage and initial the Past Due Declaration below
- Sign / initial the attached quote
- Sign / initial the attached Buyer Coverage List*

Please return your Acceptance and documents to my attention via fax 866-470-2410 or email trgadmin@traderiskgroup.com.

Trade Risk Group cannot bind coverage.  Formal binding will occur once all clarifications have been satisfied and the underwriters conduct a final review.  Premium must be paid for coverage to be in effect.

***Brokerage commission and fees for arranging the insurance are considered fully earned and due upon inception of the policy.***

We would like to thank you for your business and the opportunity to serve you and your company.

Sincerely,
Trade Risk Group

Accepted by: _Mary E Mooney_

Print Name: _Mary Mooney_

Title: _CFO_

Acceptance Date: _5/23/19_

Effective Date of Coverage: June 1, 2019

*In order to address any potential coverage issues at inception, please forward to our attention a list all Buyers who are seriously past due, causing you concern or may be a claim.  If none, please initial here: _MM_



• *2929 Allen Parkway PL 12* •   *Houston TX 77019*• *Tel: (713)-342-7463* •

## BINDER

| TO: | FROM: |
|---|---|
| Jay Tenney | Jasmina Vigil |
| COMPANY: | DATE: |
| Trade Risk Group | May 29, 2019 |
| PHONE NUMBER: | PHONE NUMBER: |
| 214-496-9905 | 713.342.7463 |

## <u>Binding Confirmation of Coverage – Exclusive Group Holdings Inc.</u>

This Binding Confirmation of Coverage contains a broad outline of coverage and does not include all the terms, conditions and exclusions of the policy that may be issued to you. The policy contains the full and complete agreement with regard to coverage. Please review the policy thoroughly with your broker upon receipt and notify us promptly in writing if you have any questions. In the event of any inconsistency between the binder and the policy, the policy language shall control unless the parties agree to an amendment.

| AIG Trade Credit Policy Features |
|---|
| • Buyer Limits of Liability and Country Limits of Liability are ***Non-cancelable*** for a full policy term |
| • Online access to your policy via ***AIG Global Limits*** to track existing credit limits and request additional coverage |
| • Optional preferential collection agency rates through a global, third-party service provider - ***STA International*** |



| | |
|---|---|
| Insured: | Exclusive Group Holdings, Inc.<br>780 5th Avenue South , Suite 200<br>Naples FL 34102 |
| Broker: | Trade Risk Group<br>751 Plaza Blvd.<br>Coppell, TX 75019 |
| Loss Payee: | Arete Global, LLC<br>2117 Modena Ct.<br>Naples, FL 34105<br>Ph: 239-877-7557 |
| Coverage: | Domestic Export Credit Insurance |
| Issuing Company: | National Union Fire Insurance Company of Pittsburgh, PA |
| Period: | From June 1, 2019 to June 1, 2020 |
| Policy Limit of Liability: | $2,000,000 |
| Discretionary Credit Limit: | $0 |
| Annual Aggregate Deductible: | $0 |
| Non Qualifying Loss: | $5,000 |
| Minimum and Deposit: | $90,000 –$45,000 due up-front and $45,000 due on July 31, 2019 |
| Portion of Premium Attributable to TRIA[1]: | 1% of premium associated with domestic sales |
| Adjustment Rate: | 0.07% |
| Insured Percentage: | 90% |
| Maximum Payment Terms: | 15 days |
| Goods Insured: | Long distance minutes and data minutes |
| Policy Currency: | US Dollars |
| Broker Commission: | 15% |
| Cease Shipment/Funding: | 60 days past due |
| Buyer Limit Cancelability | Buyer limits are non-cancelable |
| Buyer Limit Fees: | $1,000 flat fee due at policy inception. |

[1]Terrorism Risk Insurance Act of 2002.



• *2929 Allen Parkway PL 12* •   *Houston TX 77019* • *Tel: (713)-342-7463* •

Minimum and Deposit Premium: Minimum and Deposit Premium is an up-front premium amount, payable and fully earned at policy inception.

Reporting:  Each quarter the Insured shall report the Gross Invoice Value of Eligible Shipments made during the preceding quarter of the annual Policy Period and an aging report.

Quarterly Adjustment Premium - Shipments Basis: The Adjustment Rate indicated above shall be applied to the cumulative sum of each shipment report. If the calculated Adjustment Premium is greater than the Minimum and Deposit Premium, the balance shall be payable within 15 days of the date of invoice.

| Additional Excluded Sales |
| --- |

- Sales made on terms of Confirmed or Unconfirmed Irrevocable Letter of Credit.
- Sales made on terms of Cash in Advance or Cash on Delivery.
- Sales made to subsidiary or associated companies of the Insured.
- Sales made to any Buyer that, at policy inception, is Insolvent or greater than **60** days past due.

**POLICYHOLDER DISCLOSURE**
**NOTICE OF TERRORISM INSURANCE COVERAGE**
**(COVERAGE INCLUDED)**

Coverage for acts of terrorism is included in your policy. You are hereby notified that under the Terrorism Risk Insurance Act, as amended in 2015, the definition of act of terrorism has changed.  As defined in Section 102(1) of the Act: The term "act of terrorism" means any act that is certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020 of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for acts of terrorism is 1%, and does not include any charges for the portion of losses covered by the United States government under the Act.



**• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •**

Approved Buyers:

| BUYER | DUNS | Country | Requested Limit Amount (USD) | Approved Limit Amount (USD) | Special Conditions |
|---|---|---|---|---|---|
| 1 Force Communications, LLC | 194469230 | USA | 800,000 | 800,000 | This buyer limit will expire July 1, 2019. Please provide financials to consider further extension. |
| **BLU-DOT TELECOMS LTD** | **222830190** | **United Kingdom** | **80,000** | **80,000** | |
| **Communication Server Services Inc.** | **077590151** | **USA** | **650,000** | **650,000** | |
| Gold Line Telemanagement Inc | 253334809 | Canada | 300,000 | 300,000 | |
| IDN Telecom, Inc. | 829103050 | USA | 800,000 | 800,000 | |
| INTERNET MOBILE COMMUNICATIONS LIMITED | 218278916 | UNITED KINGDOM | 500,000 | 500,000 | |
| **LDI Networks Inc.** | **079772371** | **USA** | **500,000** | **500,000** | |
| Nustar Communications, Inc. | 601846053 | USA | 500,000 | 500,000 | |
| Red Phone Consulting LLC | 782291095 | USA | 500,000 | 500,000 | |
| **SolidTelecoms, LLC** | **081235028** | **USA** | **500,000** | **500,000** | |
| SPLENDID TELECOM (PVT.) LIMITED | 645790648 | Pakistan | 250,000 | 250,000 | |
| TALK TODAY LIMITED | 663607696 | Hong Kong | 1,000,000 | 1,000,000 | This buyer limit will expire July 15, 2019. Please provide financials to consider further extension. |
| Tel-Pal Comm Inc | 203881693 | Canada | 40,000 | 40,000 | |
| **TELCOM TRADER LIMITED** | **534410406** | **Malaysia** | **500,000** | **500,000** | |
| **TELITEC CONNECTIONS SL** | **476425637** | **Spain** | **200,000** | **200,000** | |
| Telco Circuits, Inc. | 010104608 | USA | 500,000 | 500,000 | |
| **Telcomax LLC** | 023699212 | **USA** | **500,000** | **500,000** | **The insured percentage on this buyer limit is 85%** |
| TELCO SOLUTIONS LLC | 012457084 | USA | 500,000 | 500,000 | |
| **Telco Software Consulting & Research LLC** | **932990489** | **USA** | **650,000** | **650,000** | |
| **Triar Commerce LLC** | **842580529** | **USA** | **250,000** | **60,000** | **Please provide financials to consider higher limit.** |

Page 4 of 5



*• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •*

| | | | | | This buyer limit will expire July 1, 2019. Please provide financials to consider further extension. |
|---|---|---|---|---|---|
| UPI Telecom, Inc. | 184764769 | USA | 800,000 | 800,000 | |
| Voice Tel Canada Inc. | 203410956 | Canada | 100,000 | 100,000 | |
| **VOICEBEE LLC** | **021288265** | **USA** | **300,000** | **300,000** | |
| Wagner Telecommunications, Inc. | 018299243 | USA | 500,000 | 500,000 | |

**Approved Country List:**

| Country | USD Country Limit of Liability | Waiting Period In Days |
|---|---|---|
| CANADA | 1,000,000 | 90 Days, None for Insolvency |
| HONG KONG | 1,000,000 | 180 |
| MALAYSIA | 400,000 | 180 |
| PAKISTAN | 250,000 | 270 |
| SPAIN | 200,000 | 180 |
| UNITED KINGDOM | 2,000,000 | 120 |
| USA | 2,000,000 | 90 Days, None for Insolvency |

Sincerely,

Senior underwriter –Trade credit



• *2929 Allen Parkway PL 12* • *Houston TX 77019* • *Tel: (713)-342-7463* •

## NON BINDING INDICATION

| TO: | FROM: |
|---|---|
| Jay Tenney | Jasmina Vigil |
| COMPANY: | DATE: |
| Trade Risk Group | June 05, 2020 |
| PHONE NUMBER: | PHONE NUMBER: |
| 214-496-9905 | 713.342.7463 |

## <u>Non Binding Indication – Exclusive Group Holdings Inc.</u>

We are pleased to offer a preliminary non-binding indication for the captioned submission. Please
that final terms and conditions can only be quoted after our review of any required documentation
*Required Information section*). The terms and conditions offered below shall expire thirty (30) day
following the date of this memorandum, unless withdrawn earlier.

| AIG Trade Credit Policy Features |
|---|
| • Buyer Limits of Liability and Country Limits of Liability are ***Non-cancelable*** for a full policy term<br><br>• Online access to your policy via ***AIG Global Limits*** to track existing credit limits and request additional coverage<br><br>• Optional preferential collection agency rates through a global, third-party service provider - ***STA International*** |

Page 1 of 6



**• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •**

Insured:                            Exclusive Group Holdings, Inc.
                                    780 5th Avenue South , Suite 200
                                    Naples FL 34102

Broker:                             Trade Risk Group
                                    751 Plaza Blvd.
                                    Coppell, TX 75019

Loss Payee:                         Arete Global, LLC
                                    2117 Modena Ct.
                                    Naples, FL 34105
                                    Ph: 239-877-7557

Coverage:                           Domestic Export Credit Insurance

Issuing Company:                    National Union Fire Insurance Company of Pittsburgh, PA

Period:                             From June 1, 2020 to June 1, 2021

                                    $80,500 due up-front and $80,500 due 30 days after binding

**Policy Limit of Liability:**      **$4,000,000**

Discretionary Credit Limit:         $0

Annual Aggregate Deductible:        $200,000

Non Qualifying Loss:                $50,000

Minimum and Deposit:                $161,000

Adjustment Rate:                    0.10%

Insured Percentage:                 90%

Maximum Payment Terms:              15 days

Goods Insured:                      Long distance minutes and data minutes

Policy Currency:                    US Dollars

Broker Commission:                  15%

Cease Shipment/Funding:             30 days past due

Buyer Limit Cancelability           Buyer limits are non-cancelable

Buyer Limit Fees:                   $1,000 flat fee due at policy inception.

[1]Terrorism Risk Insurance Act of 2002.



*• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •*

| |
|---|
| <u>Minimum and Deposit Premium</u>: Minimum and Deposit Premium is an up-front premium amount, payable and fully earned at policy inception. |
| <u>Reporting</u>:  Each quarter the Insured shall report the Gross Invoice Value of Eligible Shipments made during the preceding quarter of the annual Policy Period and an aging report. |

| |
|---|
| <u>Quarterly Adjustment Premium - Shipments Basis:</u> The Adjustment Rate indicated above shall be applied to the cumulative sum of each shipment report. If the calculated Adjustment Premium is greater than the Minimum and Deposit Premium, the balance shall be payable within 15 days of the date of invoice. |

| Additional Excluded Sales |
|---|
| <ul><li>Sales made on terms of Confirmed or Unconfirmed Irrevocable Letter of Credit.</li><li>Sales made on terms of Cash in Advance or Cash on Delivery.</li><li>Sales made to subsidiary or associated companies of the <u>Insured.</u></li><li>Sales made to any Buyer that, at policy inception, is Insolvent or greater than **60** days past due.</li></ul> |

Page 3 of 6



*• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •*

**Approved Buyers:**

| BUYER | DUNS | Country | Requested Limit Amount (USD) | Approved Limit Amount (USD) | Special Conditions |
|---|---|---|---|---|---|
| ALGORBET LTD | 219456042 | UNITED KINGDOM | 700,000 | TBD | Please advise how the Buyer was affected by CV-19 and 03/20 financials to consider further extension. |
| Comdata Partners Corp | 016528495 | UNITED STATES OF AMERICA | 400,000 | 400,000 | This buyer limit will expire on August 15, 2020. Please provide 06/20 financials to consider further extension. |
| Communication Server Services Inc | 077590151 | UNITED STATES OF AMERICA | 650,000 | 500,000 | This buyer limit will expire on July 1, 2020. Please provide 12/19 and 03/20 financials to consider further extension. |
| Communications and Consulting Services | 797908154 | UNITED STATES OF AMERICA | 650,000 | 500,000 | This buyer limit will expire on July 1, 2020. Please provide 12/19 and 03/20 financials to consider further extension. |
| Gold Line Telemanagement Inc | 253334809 | CANADA | 300,000 | 200,000 | This buyer limit will expire on July 15, 2020. Please provide 12/19 and available interims to consider further extension. |
| IDN TELECOM, INC. | 829103050 | UNITED STATES OF AMERICA | 800,000 | 600,000 | This buyer limit will expire on September 1, 2020. Please provide 06/20 financials to consider further extension. |
| **INTERNET MOBILE COMMUNICATIONS LIMITED** | **218278916** | **UNITED KINGDOM** | **500,000** | **400,000** | |
| IT JEDAN D.O.O. | 644642907 | CROATIA | 100,000 | 100,000 | This buyer limit will expire on July 1, 2020. Please provide 12/19 financials to consider further extension. |
| Jerri's Voip Solutions, LLC | 117146661 | UNITED STATES OF AMERICA | 650,000 | 300,000 | This buyer limit will expire on August 1, 2020. Please provide 12/19 and 06/20 financials to consider further extension. |
| MINIINTL PTE LTD | 222321367 | UNITED KINGDOM | 150,000 | 150,000 | This buyer limit will expire on August 1, 2020. Please provide 01/20 and if available 06/20 financials to consider further extension. |



*• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •*

| | | | | | |
|---|---|---|---|---|---|
| MULTI-TELCO, LLC | 063700008 | UNITED STATES OF AMERICA | 350,000 | 350,000 | This buyer limit will expire on October 1, 2020. Please provide 06/20 financials to consider further extension. |
| Phone Works, Inc. | 024359039 | UNITED STATES OF AMERICA | 450,000 | 450,000 | This buyer limit will expire October 1, 2020. Please provide financials to consider further extension. |
| SOLIDTELECOMS, LLC | 081235028 | UNITED STATES OF AMERICA | 500,000 | 200,000 | This buyer limit will expire July 1, 2020. Please provide 12/19 and 03/20 financials to consider further extension. |
| SPLENDID TELECOM (PVT.) LIMITED | 645790648 | PAKISTAN | 250,000 | 100,000 | This buyer limit will expire July 1, 2020. Please provide 12/19 and 03/20 financials to consider further extension. |
| Tel-Pal Comm Inc. | 203881693 | CANADA | 40,000 | 40,000 | This buyer limit will expire September 1, 2020. Please provide 12/19 and 06/20 financials to consider further extension. |
| **Telco Circuits, Inc.** | **010104608** | **UNITED STATES OF AMERICA** | **500,000** | **500,000** | **This buyer limit will expire December 1, 2020 to review their 06/20 financials.** |
| Telco Enterprise, Inc. | 056751093 | UNITED STATES OF AMERICA | 300,000 | 150,000 | This buyer limit will expire July 1, 2020. Please provide 12/19 and 03/20 financials to consider |
| Telco Software Consulting & Research LLC | 932990489 | UNITED STATES OF AMERICA | 650,000 | TBD | Please provide 12/19 and 03/20 financials to consider a limit on this name |
| TELCO SOLUTIONS LLC | 012457084 | UNITED STATES OF AMERICA | 500,000 | 500,000 | This buyer limit will expire October 1, 2020. Please provide 06/20 financials to consider further extension. |
| TELCOM TRADER LIMITED | 534410406 | MALAYSIA | 500,000 | 200,000 | This buyer limit will expire September 1, 2020. Please provide 06/20 financials to consider further extension. |
| TELCOMAX LLC | 023699212 | UNITED STATES OF AMERICA | 500,000 | 500,000 | This buyer limit will expire July 1, 2020. Please provide 12/19 and 03/20 financials to consider further extension. |
| TELITEC CONNECTIONS SL | 476425637 | SPAIN | 200,000 | 200,000 | This buyer limit will expire July 1, 2020. Please provide 12/19 and 03/20 financials to consider further extension. |



*• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •*

| | | | | | |
|---|---|---|---|---|---|
| Triar Commerce LLC | 842580529 | UNITED STATES OF AMERICA | 60,000 | 60,000 | This buyer limits expires on August 15, 2020. Please provide FYE19 and 06/20 financials to consider further extension. |
| Voice Tel Canada Inc | 203410956 | CANADA | 100,000 | TBD | Provided income statement. We need a balance sheet FYE19 and 03/20.Also they had net loss s of 03/20. Please provide an info on how they were impacted by CV-19 |
| Voicebee LLC | 021288265 | UNITED STATES OF AMERICA | 300,000 | 300,000 | This buyer limit will expire September 1, 2020. Please provide 06/20 financials to consider further extension. |
| VOIP SERVICES INC | 064659159 | UNITED STATES OF AMERICA | 500,000 | 300,000 | This buyer limit will expire August 1, 2020. Please provide 06/20 financials to consider further extension. |
| Voister Telecom Inc. | 078790194 | UNITED STATES OF AMERICA | 500,000 | None | Bankruptcy |
| **Total:** | | | **11,100,000** | **7,000,000** | |

*The insured is able to cancel the policy by no later than Thursday October1, 2020 for a pro-rated return of M&D premium if the "approved amount in aggregate" divided by  the "requested amount in aggregate" is less than 65% for the buyers with a temporary buyer limit expiration as per the NBI of June 5, 2020.   This is subject to no claims submitted and a signed release of liability.*

**Approved Country List:**

| Country | USD Country Limit of Liability | Waiting Period In Days |
|---|---|---|
| CANADA | 400,000 | 90 Days, None for Insolvency |
| CROATOA | 100,000 | 180 days |
| MALAYSIA | 500,000 | 180 |
| PAKISTAN | 250,000 | 270 |
| SPAIN | 200,000 | 180 |
| UNITED KINGDOM | 1,500,000 | 120 |
| USA | 2,000,000 | 90 Days, None for Insolvency |

Sincerely,

Senior underwriter –Trade Credit



Trade Risk Group
a dba of Acrisure, LLC.
305 Floral Vale Blvd.
Yardley, PA 19067
(P) 215-860-1900
trgadmin@traderiskgroup.com

**Credit Insurance Quotation Acceptance**

Please see the attached, non-binding Quotation and Buyer Coverage List for:

| | |
|---|---|
| Insured: | Exclusive Group Holdings, Inc |
| Address: | 780 5th Avenue South, Suite 200 |
| City, State, Zip: | Naples, FL 34102 |
| | |
| Underwriter: | AIG |
| AM Best / S&P / Moody's / Fitch Ratings | A / A+ / A2 / A |
| Quote Date: | June 5, 2020 |
| Buyer Coverage List Date: | June 5, 2020 |

Please review the offer and call me with any questions or concerns.

To formally accept the attached Quotation and the terms, conditions, and provisions set forth in the policy, please:
- Sign, Date, indicate Effective Date of Coverage and initial the Past Due Declaration below
- Sign / initial the attached quote
- Sign / initial the attached Buyer Coverage List*

Please return your Acceptance and documents to my attention via fax 866-470-2410 or email trgadmin@traderiskgroup.com.

Trade Risk Group cannot bind coverage.  Formal binding will occur once all clarifications have been satisfied and the underwriters conduct a final review.  Premium must be paid for coverage to be in effect.

***Brokerage commission and fees for arranging the insurance are considered fully earned and due upon inception of the policy.***

We would like to thank you for your business and the opportunity to serve you and your company.

Sincerely,
Trade Risk Group

**Accepted by:** _Mary E Mooney_

**Print Name:** Mary Mooney

**Title:** COO

**Acceptance Date:** June 5, 2020

**Effective Date of Coverage:** June 1, 2020

***In order to address any potential coverage issues at inception, please forward to our attention a list all Buyers who are seriously past due, causing you concern or may be a claim.  If none, please initial here: _____***

---



**• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •**

---

**BINDER**

---

| | |
|---|---|
| TO: | FROM: |
| Jay Tenney | Jasmina Vigil |
| COMPANY: | DATE: |
| Trade Risk Group | June 09, 2020 |
| PHONE NUMBER: | PHONE NUMBER: |
| 214-496-9905 | 713.342.7463 |

---

## <u>Binding Confirmation of Coverage – Exclusive Group Holdings Inc.</u>

This Binding Confirmation of Coverage contains a broad outline of coverage and does not include all the terms, conditions and exclusions of the policy that may be issued to you. The policy contains the full and complete agreement with regard to coverage. Please review the policy thoroughly with your broker upon receipt and notify us promptly in writing if you have any questions. In the event of any inconsistency between the binder and the policy, the policy language shall control unless the parties agree to an amendment.

| AIG Trade Credit Policy Features |
|---|
| • Buyer Limits of Liability and Country Limits of Liability are ***Non-cancelable*** for a full policy term |
| • Online access to your policy via ***AIG Global Limits*** to track existing credit limits and request additional coverage |
| • Optional preferential collection agency rates through a global, third-party service provider - ***STA International*** |

Page 1 of 6



**• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •**

| | |
|---|---|
| Insured: | Exclusive Group Holdings, Inc.<br>780 5th Avenue South , Suite 200<br>Naples FL 34102 |
| Broker: | Trade Risk Group<br>751 Plaza Blvd.<br>Coppell, TX 75019 |
| Loss Payee: | Arete Global, LLC<br>2117 Modena Ct.<br>Naples, FL 34105<br>Ph: 239-877-7557 |
| Coverage: | Domestic Export Credit Insurance |
| Issuing Company: | National Union Fire Insurance Company of Pittsburgh, PA |
| Period: | From June 1, 2020 to June 1, 2021 |
| Policy Limit of Liability: | $4,000,000 |
| Discretionary Credit Limit: | $0 |
| Annual Aggregate Deductible: | $200,000 |
| Non Qualifying Loss: | $50,000 |
| Minimum and Deposit: | $161,000 |
| | $80,500 due up-front and $80,500 due 30 days after binding |
| Adjustment Rate: | 0.10% |
| Insured Percentage: | 90% |
| Maximum Payment Terms: | 15 days |
| Goods Insured: | Long distance minutes and data minutes |
| Policy Currency: | US Dollars |
| Broker Commission: | 15% |
| Cease Shipment/Funding: | 30 days past due |
| Buyer Limit Cancelability | Buyer limits are non-cancelable |
| Buyer Limit Fees: | $1,000 flat fee due at policy inception. |

[1]Terrorism Risk Insurance Act of 2002.



*• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •*

Minimum and Deposit Premium: Minimum and Deposit Premium is an up-front premium amount, payable and fully earned at policy inception.

Reporting:  Each quarter the Insured shall report the Gross Invoice Value of Eligible Shipments made during the preceding quarter of the annual Policy Period and an aging report.

Quarterly Adjustment Premium - Shipments Basis: The Adjustment Rate indicated above shall be applied to the cumulative sum of each shipment report. If the calculated Adjustment Premium is greater than the Minimum and Deposit Premium, the balance shall be payable within 15 days of the date of invoice.

| Additional Excluded Sales |
| --- |
| • Sales made on terms of Confirmed or Unconfirmed Irrevocable Letter of Credit.<br>• Sales made on terms of Cash in Advance or Cash on Delivery.<br>• Sales made to subsidiary or associated companies of the Insured.<br>• Sales made to any Buyer that, at policy inception, is Insolvent or greater than **60** days past due. |

Page 3 of 6



• *2929 Allen Parkway PL 12* •   *Houston TX 77019* • *Tel: (713)-342-7463* •

**Approved Buyers:**

| BUYER | DUNS | Country | Requested Limit Amount (USD) | Approved Limit Amount (USD) | Special Conditions |
|---|---|---|---|---|---|
| ALGORBET LTD | 219456042 | UNITED KINGDOM | 700,000 | TBD | Please advise how the Buyer was affected by CV-19 and 03/20 financials to consider further extension. |
| Comdata Partners Corp | 016528495 | UNITED STATES OF AMERICA | 400,000 | 400,000 | This buyer limit will expire on August 15, 2020. Please provide 06/20 financials to consider further extension. |
| **Communication Server Services Inc.** | **077590151** | **UNITED STATES OF AMERICA** | **650,000** | **500,000** | |
| Communications and Consulting Services | 797908154 | UNITED STATES OF AMERICA | 650,000 | 500,000 | This buyer limit will expire on July 1, 2020. Please provide 12/19 and 03/20 financials to consider further extension. |
| Gold Line Telemanagement Inc | 253334809 | CANADA | 300,000 | 200,000 | This buyer limit will expire on July 15, 2020. Please provide 12/19 and available interims to consider further extension. |
| IDN TELECOM, INC. | 829103050 | UNITED STATES OF AMERICA | 800,000 | 600,000 | This buyer limit will expire on September 1, 2020. Please provide 06/20 financials to consider further extension. |
| INTERNET MOBILE COMMUNICATIONS LIMITED | 218278916 | UNITED KINGDOM | 500,000 | 400,000 | |
| IT JEDAN D.O.O. | 644642907 | CROATIA | 100,000 | 100,000 | This buyer limit will expire on July 1, 2020. Please provide 12/19 financials to consider further extension. |
| Jerri's Voip Solutions, LLC | 117146661 | UNITED STATES OF AMERICA | 650,000 | 300,000 | This buyer limit will expire on August 1, 2020. Please provide 12/19 and 06/20 financials to consider further extension. |
| MINIINTL PTE LTD | 222321367 | UNITED KINGDOM | 150,000 | 150,000 | This buyer limit will expire on August 1, 2020. Please provide 01/20 and if available 06/20 financials to consider further extension. |



*• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •*

| MULTI-TELCO, LLC | 063700008 | UNITED STATES OF AMERICA | 350,000 | 350,000 | This buyer limit will expire on October 1, 2020. Please provide 06/20 financials to consider further extension. |
| Phone Works, Inc. | 024359039 | UNITED STATES OF AMERICA | 450,000 | 450,000 | This buyer limit will expire October 1, 2020. Please provide financials to consider further extension. |
| SOLIDTELECOMS, LLC | 081235028 | UNITED STATES OF AMERICA | 500,000 | 200,000 | This buyer limit will expire July 1, 2020. Please provide 12/19 and 03/20 financials to consider further extension. |
| SPLENDID TELECOM (PVT.) LIMITED | 645790648 | PAKISTAN | 250,000 | 100,000 | This buyer limit will expire July 1, 2020. Please provide 12/19 and 03/20 financials to consider further extension. |
| Tel-Pal Comm Inc. | 203881693 | CANADA | 40,000 | 40,000 | This buyer limit will expire September 1, 2020. Please provide 12/19 and 06/20 financials to consider further extension. |
| Telco Circuits, Inc. | 010104608 | UNITED STATES OF AMERICA | 500,000 | 500,000 | This buyer limit will expire December 1, 2020 to review their 06/20 financials. |
| Telco Enterprise, Inc. | 056751093 | UNITED STATES OF AMERICA | 300,000 | 150,000 | This buyer limit will expire July 1, 2020. Please provide 12/19 and 03/20 financials to consider |
| Telco Software Consulting & Research LLC | 932990489 | UNITED STATES OF AMERICA | 650,000 | TBD | Please provide  12/19 and 03/20 financials to consider a limit on this name |
| TELCO SOLUTIONS LLC | 012457084 | UNITED STATES OF AMERICA | 500,000 | 500,000 | This buyer limit will expire October 1, 2020. Please provide 06/20 financials to consider further extension. |
| TELCOM TRADER LIMITED | 534410406 | MALAYSIA | 500,000 | 200,000 | This buyer limit will expire September 1, 2020. Please provide 06/20 financials to consider further extension. |
| **TELCOMAX LLC** | **023699212** | **UNITED STATES OF AMERICA** | **500,000** | **500,000** | |
| TELITEC CONNECTIONS SL | 476425637 | SPAIN | 200,000 | 200,000 | This buyer limit will expire July 1, 2020. Please provide 12/19 and 03/20 financials to consider further extension. |
| Triar Commerce LLC | 842580529 | UNITED | 60,000 | 60,000 | This buyer limits expires on |



**• 2929 Allen Parkway PL 12 •   Houston TX 77019• Tel: (713)-342-7463 •**

| | | STATES OF AMERICA | | | August 15, 2020. Please provide FYE19 and 06/20 financials to consider further extension. |
|---|---|---|---|---|---|
| Voice Tel Canada Inc | 203410956 | CANADA | 100,000 | TBD | Provided income statement. We need a balance sheet FYE19 and 03/20.Also they had net loss s of 03/20. Please provide an info on how they were impacted by CV-19 |
| Voicebee LLC | 021288265 | UNITED STATES OF AMERICA | 300,000 | 300,000 | This buyer limit will expire September 1, 2020. Please provide 06/20 financials to consider further extension. |
| VOIP SERVICES INC | 064659159 | UNITED STATES OF AMERICA | 500,000 | 300,000 | This buyer limit will expire August 1, 2020. Please provide 06/20 financials to consider further extension. |
| Voister Telecom Inc. | 078790194 | UNITED STATES OF AMERICA | 500,000 | None | Bankruptcy |
| **Total:** | | | **11,100,000** | **7,000,000** | |

*The insured is able to cancel the policy by no later than Thursday October1, 2020 for a pro-rated return of M&D premium if the "approved amount in aggregate" divided by the "requested amount in aggregate" is less than 65% for the buyers with a temporary buyer limit expiration as per the NBI of June 5, 2020.   This is subject to no claims submitted and a signed release of liability.*

**Approved Country List:**

| Country | USD Country Limit of Liability | Waiting Period In Days |
|---|---|---|
| CANADA | 400,000 | 90 Days, None for Insolvency |
| CROATOA | 100,000 | 180 days |
| MALAYSIA | 500,000 | 180 |
| PAKISTAN | 250,000 | 270 |
| SPAIN | 200,000 | 180 |
| UNITED KINGDOM | 1,500,000 | 120 |
| USA | 2,000,000 | 90 Days, None for Insolvency |

Sincerely,

Senior underwriter –Trade Credit

# EXHIBIT C

**ENDORSEMENT NO. 2**

This endorsement, effective 12:01 A.M. **June 1, 2019**, forms a part of Policy No. **11184726**-**19** issued to **Exclusive Group Holdings, Inc.** by, **National Union Fire Insurance Company of Pittsburgh, PA**.

**PREMIUM ENDORSEMENT**
**RATE ON ELIGIBLE SHIPMENTS**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**DOMESTIC AND EXPORT CREDIT INSURANCE POLICY**

On the Declarations, ITEM IV., Premium, is amended to include the following:

1. The minimum and deposit premium for the **policy period** shall be $**90,000**.

2. The portion of minimum and deposit premium attributable to coverage for Acts of Terrorism as defined under Sec. 102, Definitions, of the Terrorism Risk Insurance Act of 2002, as amended, shall be **1%** .

3. The adjustment premium for the **policy period** shall be calculated using the following rate(s):

    **0.07%**

    The rate(s) above shall be applied to the invoice value of the actual annual **eligible shipments** made during the **policy period**. If the calculated adjustment premium is greater than the minimum and deposit premium noted in item 1. above, plus any adjustment premium previously paid, then the balance shall be immediately due and payable.

4. Reporting of **eligible shipments**:

    The **insured** shall report the invoice value of **eligible shipments** within thirty (30) days of each report date noted below.

<u>Report Dates</u>

| September 1, 2019 | March 1, 2020 |
|-------------------|---------------|
| December 1, 2019 | June 1, 2020 |

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of this policy except as hereinabove set forth.

_____
AUTHORIZED REPRESENTATIVE

110121 (11/11)

ENDORSEMENT NO. 3

This endorsement, effective 12:01 A.M. **June 1, 2019**, forms a part of Policy No. **11184726**-**19** issued to **Exclusive Group Holdings, Inc.** by, **National Union Fire Insurance Company of Pittsburgh, PA**.

<u>**FLORIDA AMENDATORY ENDORSEMENT**</u>

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY**.

*This endorsement modifies insurance provided under the following*:

DOMESTIC AND EXPORT CREDIT INSURANCE SHIPMENTS FORM

**I.**      The **POLICY DECLARATIONS** are amended to include the following:

XVII.    Endorsements Which Attach to and Form Part of This Policy:

| Title | Form No. | Edition Date |
|---|---|---|
| Country Limits of Liability and Waiting Periods | 110109 | 11/11 |
| Florida Addendum To The Declarations | 74825 | 09/13 |
| Premium Endorsement-Rate on Eligible Shipments | 110121 | 11/11 |
| Florida Amendatory Endorsement | 110166 | 10/12 |
| Exclusions Endorsement | 110114 | 11/11 |
| Federal Share Of Compensation Under Tria And Cap On Losses Endorsement | 125595 | 03/17 |
| Economic Sanctions Endorsement | 89644 | 06/13 |
| Electronic Listing Of Buyer Limits Endorsement (With Country Limits Of Liability) | 117101 | 06/14 |
| Loss Payee Endorsement | 110115 | 11/11 |

**II.**      The final sentence of the **POLICY DECLARATIONS** is deleted in its entirety and replaced with the following:

This policy is the entire agreement between the **Insured** and the Company and no terms or conditions or representations of this policy shall be waived or changed, unless agreed to in writing by an authorized representative of the Company.

**III.**      SECTION III., **EXCLUSIONS**, A. 2. is deleted in its entirety and replaced with the following:

2.   Any material breach of or inaccuracy regarding any representations made herein, or failure to perform or to fulfill any covenant or agreement made herein by the **insured**.

**IV.**      SECTION IV., **WARRANTIES AND COVENANTS** is hereby renamed **REPRESENTATIONS AND COVENANTS** and all references in the policy to "SECTION IV. WARRANTIES AND COVENANTS" shall be understood to mean "SECTION IV. REPRESENTATIONS AND COVENANTS."

V.      The first sentence of SECTION IV., **WARRANTIES AND COVENANTS**, is deleted in its entirety and replaced with the following:

>       The **insured** represents and agrees:

VI.      SECTION IV., **WARRANTIES AND COVENANTS**, H. is deleted in its entirety and replaced with the following:

> H.  That the statements contained in the application and any attachments thereto, which are hereby part of the policy, are true and that no material information has been withheld. Furthermore, that the **insured** has no knowledge at policy inception of any circumstances that may reasonably be expected to result in a **loss** hereunder, except for that which is specifically disclosed about particular **buyers** in the application.    The **insured** represents that all information given by the **insured** to the Company after the inception of the **policy period** will be true to the best of the **insured's** knowledge.

VII.      SECTION V., **PROOF OF PAYMENT OF CLAIMS AND RECOVERIES**, D. is deleted in its entirety and replaced with the following:

> D.  The responsibility for proving a **loss** under this policy and evidencing that all conditions and representations have been complied with shall at all times rest with the **insured**.

VIII.      SECTION VI., **GENERAL CONDITIONS**, paragraph **ACTION AGAINST US**, is deleted in its entirety and replaced by the following:

> **ACTION AGAINST US:** No suit, action or proceeding for recovery of any **loss** under this Policy will be sustainable in any court of law, equity or other tribunal unless all the requirements of this Policy are complied with and the same be commenced within five (5) years next after a Statement of Loss has been filed with **us** by **you.**

IX.      SECTION VI., **GENERAL CONDITIONS**, paragraph **C. ARBITRATION**, is hereby deleted in its entirety and replaced by the following:

> **C.  ARBITRATION:**  Should any dispute arise between **you** and **us** under this policy which cannot be settled amicably, both parties must be in agreement to voluntarily enter into arbitration and to mutually agree to make it binding at the time of the dispute. The matter in dispute shall be referred to three persons in Florida, one to be appointed by each of the parties hereto, and the third by the two so chosen who shall act as chairman of the proceedings, or such other procedure as is currently in accordance with the rules of the American Arbitration Association. Should either **you** or **we** fail to appoint an arbitrator or should the two arbitrators so chosen fail to agree on a third arbitrator, then the parties to the arbitration shall apply to the appropriate federal or state court in Florida for the appointment of such arbitrator. No award of the arbitrators or judgment of any court with respect to any award, dispute or controversy shall be entered in an amount exceeding the applicable limits set forth in this policy. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Florida, without giving effect to any conflict of laws principles that would cause the application of the laws of any other jurisdiction, and any disputes concerning this Agreement and/or the Proposal shall be subject to the exclusive jurisdiction of the federal courts in Florida, or if such courts do not have jurisdiction then the state courts of Florida.

**X.**      SECTION VI., **GENERAL CONDITIONS**, paragraph **G. CHOICE OF LAW AND FORUM**, is deleted in its entirety and replaced by the following:

> **G. CHOICE OF LAW:** The construction, validity and performance of this Policy will be governed by the laws of the U.S.A. and the State of Florida.

**XI.**      SECTION   VI.,   **GENERAL   CONDITIONS**,   paragraph,   **H.   CONCEALMENT, MISREPRESENTATION, OR FRAUD**, is deleted and replaced by the following:

> **H. CONCEALMENT, MISREPRESENTATION, OR FRAUD**:
> This policy may be null and void in case of fraud, concealment, or intentional misrepresentation by **you** or an **insured** of a material fact concerning:
>
> 1.      this policy or the procurement thereof; or
>
> 2.      an **insured**; or
>
> 3.      **your** interest in any other person or organization qualifying as an **insured** under this Policy; or
>
> 4.      any **loss** or claim presented to **us** under this policy.
>
> We may seek any and all remedies in law and/or equity that we may have against **you** and/or any other person or organization qualifying as an **insured** resulting from **your** and/or any **insured's** fraud, concealment or intentional misrepresentation of any material fact concerning this policy or procurement thereof, an **insured**, or any **loss** or claims presented to **us** under this policy.

**XII.**      SECTION VI., **GENERAL CONDITIONS**, paragraph, **NOTICE**, is amended to include the following:

To obtain information concerning coverage and for assistance, the insured may call us toll free at 1-877-867-3783.

All other terms, conditions, and exclusions of this policy shall remain unchanged.

_____
AUTHORIZED REPRESENTATIVE

110166 (10/12)

**ENDORSEMENT NO. 4**

This endorsement, effective 12:01 A.M. **June 1, 2019**, forms a part of Policy No. **11184726**-**19** issued to **Exclusive Group Holdings, Inc.** by, **National Union Fire Insurance Company of Pittsburgh, PA**.

**EXCLUSIONS ENDORSEMENT**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**DOMESTIC AND EXPORT CREDIT INSURANCE POLICY**

As respects this endorsement, SECTION III., EXCLUSIONS, subsection B., is hereby amended to include the following:

- Sales made on terms of Confirmed or Unconfirmed Irrevocable Letter of Credit.
- Sales made on terms of Cash in Advance or Cash on Delivery.
- Sales made to subsidiary or associated companies of the Insured.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of this policy except as hereinabove set forth.

_____
AUTHORIZED REPRESENTATIVE

110114 (11/11)

74

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT NO. 5**

This endorsement, effective 12:01 A.M. **June 1, 2019**, forms a part of Policy No. **11184726-19** issued to **Exclusive Group Holdings, Inc.**  by, **National Union Fire Insurance Company of Pittsburgh, PA**.

<u>**ECONOMIC SANCTIONS ENDORSEMENT**</u>

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

*This endorsement modifies insurance provided under the following:*

**DOMESTIC AND EXPORT CREDIT INSURANCE POLICY**

The Insurer shall not be deemed to provide cover and the Insurer shall not be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose the Insurer, its parent company or its ultimate controlling entity to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union or the United States of America.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of this policy except as hereinabove set forth.

_____
AUTHORIZED REPRESENTATIVE

89644 6-13

**ENDORSEMENT NO. 6**

This endorsement, effective 12:01 A.M. **June 1, 2019**, forms a part of Policy No. **11184726**-**19** issued to **Exclusive Group Holdings, Inc.** by, **National Union Fire Insurance Company of Pittsburgh, PA**.

**FEDERAL SHARE OF COMPENSATION UNDER TRIA AND CAP ON LOSSES ENDORSEMENT**

This endorsement modifies insurance provided by this Policy:

**DISCLOSURE**

You should know that where coverage is provided by this Policy for losses resulting from "Certified Acts of Terrorism" (as defined by Section 102 (1) of United States Terrorism Risk Insurance Act), such losses may be partially reimbursed by the United States Government under a formula established by federal law.  However, your Policy may contain other exclusions which might affect your coverage such as, an exclusion for nuclear events.  Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning January 1, 2018; 81% beginning January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage.
You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits United States Government reimbursement as well as insurers' liability for losses resulting from "Certified Acts of Terrorism" when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion in a calendar year and if we have met our insurer deductible, we are not liable for the payment of any portion of the amount of such losses that exceeds $100 billion; and for aggregate insured losses up to $100 billion, we will only pay a pro rata share of such insured losses as determined by the Secretary of the Treasury.

All other terms and conditions of the Policy remain the same.

_____
AUTHORIZED REPRESENTATIVE

125595 (03/17)        ©American International Group, Inc. All Rights Reserved.

**ENDORSEMENT NO. 7**

This endorsement, effective 12:01 A.M. **June 1, 2019**, forms a part of Policy No. **11184726-19** issued to **Exclusive Group Holdings, Inc.** by, **National Union Fire Insurance Company of Pittsburgh, PA**.

**ELECTRONIC LISTING OF BUYER LIMITS ENDORSEMENT**
**(With Country Limits of Liability)**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

DOMESTIC AND EXPORT CREDIT INSURANCE POLICY

I.      The **POLICY DECLARATIONS** are hereby amended to include the following:

      **Uniform Resource Locator**: https://www-222.aig.com/globallimits/


II.     **SECTION II., DEFINITIONS**, C., **Buyer Limit**, is deleted in its entirety and replaced with the following:

    C.  **Buyer Limit** means the limit specified by the Company for that **buyer**. If no such limit has been specified by the Company, then an amount not exceeding the **discretionary credit limit,** as specified in ITEM VI., of the Declarations, provided such amount has been approved in writing by the **insured** for that **buyer** at the time of or prior to shipment. **Buyer limits** specified by the Company shall be listed in the **Uniform Resource Locator** of the Company and remain available for review by the **insured**.


III.    **SECTION II., DEFINITIONS**, F., **Country Limit of Liability**, is deleted in its entirety and replaced with the following:

    F.  **Country Limit of Liability** means the Company's maximum liability for all **loss** in each particular country specified by the Company.


IV.     Solely with respect to coverage afforded by this endorsement, **SECTION VI.**, **GENERAL CONDITIONS**, is amended include the following:

    At policy inception, the Company shall provide the **insured** and the **broker** individual passwords to access the **Uniform Resource Locator. Buyer limits** and **country limits of liability** specified by the Company shall be listed in the **Uniform Resource Locator** and remain available for review by the **insured** or the **broker.** The **buyer limits** and **country limits of liability** listed in the **Uniform Resource Locator** for the **insured** shall be deemed to be attached to this policy and shall be the sole record of **buyer limits** and **country limits of liability** specified by the Company.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of this policy except as hereinabove set forth.

_____
AUTHORIZED REPRESENTATIVE

117101 (06/14)

**ENDORSEMENT NO. 8**

This endorsement, effective 12:01 A.M. **June 1, 2019**, forms a part of Policy No. **11184726**-19 issued to **Exclusive Group Holdings, Inc.**  by, **National Union Fire Insurance Company of Pittsburgh, PA**.

<u>**LOSS PAYEE ENDORSEMENT**</u>

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**DOMESTIC AND EXPORT CREDIT INSURANCE POLICY**

As respects this endorsement, SECTION VI., **ASSIGNMENT**, subsection D., it is understood and agreed that any amounts payable under this policy shall be paid to the **insured** and/or to the following parties as their interests may appear:

> Arete Global, LLC
> 2117 Modena Ct.
> Naples, FL 34105
> Ph: 239-877-7557

It is further understood and agreed that any claims filed in connection with a **loss** under the policy will be adjusted with the **insured** and that the loss payee named above will have no rights to pursue a claim directly against the **company** or assume any other rights under this policy.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of this policy except as hereinabove set forth.

_____
AUTHORIZED REPRESENTATIVE

110115 (11/11)

**ENDORSEMENT NO. 9**

This endorsement, effective 12:01 A.M. **August 1, 2019**, forms a part of Policy No. **11184726**-**19** issued to **Exclusive Group Holdings, Inc.**  by, **National Union Fire Insurance Company of Pittsburgh, PA**.

**AMENDMENT TO ITEM V. OF THE POLICY DECLARATIONS**

*This endorsement modifies insurance provided under the following*:

   DOMESTIC AND EXPORT CREDIT INSURANCE SHIPMENTS FORM

It is hereby understood and agreed that Item V. of the **POLICY DECLARATIONS, Policy Limit of Liability**, is deleted in its entirety and replaced with the following:

   V.   Policy Limit of Liability:   **$3,000,000**

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of this policy except as hereinabove set forth.

_____
AUTHORIZED REPRESENTATIVE
September 6, 2019

117102 (06/14)

**ENDORSEMENT NO. 11**

This endorsement, effective 12:01 A.M. **January 1, 2020**, forms a part of Policy No. **11184726-19** issued to **Exclusive Group Holdings, Inc.**  by, **National Union Fire Insurance Company of Pittsburgh, PA**.

**AMENDMENT TO ENDORSEMENT NO. 9**
**AMENDMENT TO ITEM V. OF THE POLICY DECLARATIONS**

It is hereby understood and agreed that Endorsement No. 9, Amendment to Item V. Of The Policy Declarations, issued on September 6, 2019, is amended and replaced, effective January 1, 2020, with this Endorsement No.11

*This endorsement modifies insurance provided under the following*:

DOMESTIC AND EXPORT CREDIT INSURANCE SHIPMENTS FORM

It is hereby understood and agreed that Item V. of the **POLICY DECLARATIONS, Policy Limit of Liability**, is deleted in its entirety and replaced with the following:

V.    Policy Limit of Liability:    **$4,000,000**

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of this policy except as hereinabove set forth.

_____
AUTHORIZED REPRESENTATIVE
January 7, 2020

117102 (06/14)



**• 2929 Allen Parkway PL 12 • Houston TX 77019• Tel: (713)-342-7463 •**

July 9, 2020

Mr. Jay Tenney
Acrisure, LLC dba Trade Risk Group, LLC
305 Floral Vale Boulevard
Yardley, PA 19067

Dear Jay:

We are pleased to enclose the original of the following policy:

**Exclusive Group Holdings, Inc. 11184726-20**

For your convenience, we have outlined below the reporting requirements for the policy period

1.  Please remember to give immediate notice to the Company of any Buyer that may be in financial difficulty or is Insolvent, pursuant to Article VI., Item M.1. of the policy.

2.  In addition, the Insured shall report to the Company within 30 days of the end of each quarter their aging as of the last day of the preceding quarter, pursuant to Article VI. Item M. 2.

3.  Please submit the Eligible Shipment reports as outlined in Endorsement No. 2.

Your cooperation with the maintenance of this policy and the timely submission of the necessary reports is greatly appreciated.

Sincerely,

Senior underwriter –Trade Credit

JV/im



**DOMESTIC AND EXPORT CREDIT INSURANCE
SHIPMENTS FORM**

√ **NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA**
  □ **THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA**

Executive Offices: 175 Water Street, New York, New York 10038
(212) 770-7000

Policy Number: 11184726-20

**POLICY DECLARATIONS**

| | | |
|---|---|---|
| I. | Insured and Mailing Address: | Exclusive Group Holdings, Inc. |
| | | 780 5th Avenue South, Suite 200 |
| | | Naples, FL 34102 |
| II. | Broker and Mailing Address: | Acrisure, LLC dba Trade Risk Group |
| | | 305 Floral Vale Blvd |
| | | Yardley, PA 19067 |
| III. | Policy Period: | From June 1, 2020   to June 1, 2021 |
| | | (12:01 A.M. Standard Time at the |
| | | insured's address) |
| IV. | Premium: | Per Endorsement No. 2 |
| V. | Policy Limit of Liability: | $4,000,000 |
| VI. | Discretionary Credit Limit: | 0 |
| VII. | Country Limits of Liability: | Per Endorsement No. 1 |
| VIII. | Deductible: | $200,000 |
| IX. | Non Qualifying Loss Amount: | $50,000 |
| X. | Maximum Terms of Payment: | 15 days |
| XI. | Goods Insured: | Long distance minutes and data minutes |
| XII. | Insured Percentage: | 90% unless otherwise noted |
| XIII. | Credit Limit Fee: | $1,000 flat fee |
| XIV. | Commission: | 15% |
| XV. | TRIA Premium, Taxes and Surcharges N/A | |

"TRIA Premium" means the premium for certified acts of Terrorism Coverage under Terrorism Risk Insurance Act of 2002, as amended. The TRIA Premium amount indicated above is included in Premium. A copy of the TRIA disclosure is attached.

This policy is the entire agreement between the **Insured** and the Company and no terms, conditions or warranties of this policy shall be waived or changed, unless agreed to in writing by an authorized representative of the Company.

_____
Authorized Representative
July 9, 2020

110102 (11/11)

**FLORIDA ADDENDUM TO THE DECLARATIONS**

If you have questions about your insurance policy, or questions about claims relating to your insurance policy, please contact your insurer at the following:

**American International Group, Inc.**
**175 Water Street**
**New York, NY 10038**
**(212) 458-5000**

74825 (09/13)

**POLICYHOLDER NOTICE**

Thank you for purchasing insurance from a member company of American International Group, Inc. (AIG).  The AIG member companies generally pay compensation to brokers and independent agents, and may have paid compensation in connection with your policy.  You can review and obtain information about the nature and range of compensation paid by AIG member companies to brokers and independent agents in the United States by visiting our website at www.aig.com/producer-compensation or by calling 1-800-706-3102.

91222 (9/16)

# DOMESTIC AND EXPORT CREDIT INSURANCE
## SHIPMENTS FORM

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy the words **you** and **your** refer to the **Insured** shown in the Declarations, and any other person or organization qualifying as the **Insured** under this Policy. The words **we, us** and **our** refer to the company providing this insurance.

Other words and phrases that appear in boldface have special meanings. Refer to **SECTION II.**, **DEFINITIONS**.

In consideration of the premium paid and in reliance on the representations made by **you** in the application, including all written statements and materials furnished to **us** in conjunction with such application**,** attached to and made a part of this Policy, **you** and **we** agree as follows:

---

## I.   INSURING AGREEMENT

The Company shall indemnify the **insured** for **loss** directly caused by the failure of the **buyer** to pay the **insured** all or part of the invoice value of the **eligible shipments** within the **waiting period**.  The amount payable by the Company will be calculated in accordance with SECTION V., Proof and Payment of Claims and Recoveries, and will be subject to the **policy limit of liability** and other applicable terms and conditions of the policy.

---

## II.   *DEFINITIONS*

A.   **Buyer** means:

   1. A duly organized and legally existing corporation, proprietorship, partnership or government entity in the **buyer's country**.

   2. All corporations and other entities controlling, controlled by, or under common control with the **buyer** in A.1., above. "Control" means ownership directly or indirectly of more than fifty percent (50%) of the voting share capital, or effective management control of the **buyer**.

B.   **Buyer's Country** means the country from which the **buyer** is obligated to pay the **insured** under the terms of the **contract of sale**.

C.   **Buyer Limit** means the limit specified in writing by the Company for that **buyer** or, where no such limit has been specified by the Company, then an amount not exceeding the **discretionary credit limit,** as specified in ITEM VI. of the Declarations, provided such amount has been approved in writing by the **insured** for that **buyer** at the time of or prior to shipment.

   If a **buyer** includes other entities as described in A.2., above, then the **insured** shall establish an aggregate **buyer limit** for all such related entities, which shall be the applicable **buyer limit** for the purposes of the policy.

D. **Contract Currency** means the currency in which the **buyer** is obligated to pay and to deliver to the **insured** under the terms of the **contract of sale**.

E. **Contract of Sale** means a negotiable debt instrument (such as a promissory note, draft or bill of exchange) or open account documents including:

1. An invoice issued by the **insured** evidencing the transaction;

2. Written purchase order(s) from the **buyer** or other document(s) signed by the **buyer** through which the **buyer** acknowledges its obligation to the **insured**; and

3. Shipping documents evidencing the transfer of control and custody of the **goods insured** from the **insured** to the **buyer**.

The Company shall deem a negotiable debt instrument or other written acknowledgement of the invoice value from the **buyer** to constitute a duly executed **contract of sale**.

F. **Country Limit of Liability** means the amount(s) specified in ITEM VII. of the Declarations, which is the Company's maximum liability for all **loss** in each particular country.

G. **Deductible** means the amount specified in ITEM VIII. of the Declarations, which is the annual aggregate sum of **loss** incurred in connection with **eligible shipments** that the **insured** shall bear for its own account.

H. **Discretionary Credit Limit** means the amount specified in ITEM VI. of the Declarations, which is the maximum **buyer limit** the **insured** may establish for a **buyer** without obtaining approval from the Company.

I. **Dispute** means any written declaration, or the act thereof, made by a **buyer** through which the **buyer** asserts that its obligation to the **insured** is invalid, offset or otherwise diminished.

J. **Due Date** means the date payment is required to be made by the **buyer** to the **insured** under the terms of the **contract of sale**.

K. **Eligible Shipment(s)** means any and all shipment(s) of **goods insured** to the **buyer** pursuant to the **contract of sale**, provided that the **goods insured** are:

1. Shipped during the **policy period**. Shipment begins when the **goods insured** have left the custody and control of the **insured** or its agent in transit to the **buyer**;

2. Delivered as required under the **contract of sale**;

3. Sold for **contract currency** and in accordance with the **maximum terms of payment**; and

4. Shipped in conformity with the applicable export laws and regulations of the **insured's** country and the import laws and regulations of the **buyer's country**.

L. **Goods Insured** are limited to the goods specified in ITEM XI. of the Declarations.

M. **Insolvent/Insolvency** means a voluntary or involuntary petition for relief that has been filed by, or against, the **buyer** under the applicable chapter of Title 11 of the United States Code or similar statutes relating to the relief of debtors in Canada, the United Kingdom, or in euro zone countries of the European Union.

110101 (11/11)  © American International Group, Inc. All rights reserved.                    7

N.  **Insured** means the sole proprietorship, partnership, or corporation stated in ITEM I. of the Declarations.

O.  **Insured Percentage** means the percentage specified in ITEM XII. of the Declarations.

P.  **Loss** means the invoice value of **eligible shipments**, plus any **preference** payment, unpaid by the **buyer** upon its **insolvency**, or upon the expiration of the **waiting period**, less:

1.  Any discount, allowance, offset or other credit to which the **buyer** would be entitled;

2.  Any amounts received from any source as or towards payment of the **eligible shipments**;

3.  Interest; and

4.  Any applicable sales, value added or comparable tax.

Q.  **Maximum Terms of Payment**, as specified in ITEM X. of the Declarations, means the longest initial period of credit the **insured** may extend to the **buyer**.

R.  **Non Qualifying Loss Amount** means the amount specified in ITEM IX. of the Declarations.  If a **loss** does not exceed the **non qualifying loss amount**, then such amount shall be borne by the **insured** for its own account and shall not be applied to the **deductible**.

S.  **Preference** means any amount that the **insured**, after exhausting all valid defenses, is obligated to return to a **buyer** that is **insolvent** provided that such amount was received from the **buyer** as payment for an **eligible shipment** and the **insured** notified the Company in writing upon becoming aware of such obligation. The **insured** is responsible for the costs of raising valid defenses of any **preference** amounts unless otherwise agreed in writing by the Company.

T.  **Policy Limit of Liability**, as specified in ITEM V. of the Declarations, means the Company's maximum liability for the total of all **loss** insured under this policy.

U.  **Policy Period** means the period specified in ITEM III. of the Declarations.

V.  **Waiting Period** means the number of days set forth in the **country limit of liability** endorsement that must elapse from each **due date** before any **loss** is payable under this policy. The **waiting period** shall not apply to a **buyer** that is **insolvent**.

---

## III.   EXCLUSIONS

The policy does not apply to any **loss** arising out of, based upon, attributable to or involving, directly or indirectly any of the following:

A.   Any **loss(es)** caused by or resulting from the following are not covered under this policy:

1.   Wrongful or dishonest acts or omissions of the **insured** or its agents.

2.   Any material breach of or inaccuracy regarding any warranty or representations made herein, or failure to perform or to fulfill any warranty, covenant or agreement made herein by the **insured**.

3.   Nuclear reaction or nuclear radiation or radioactive contamination.

4.   War between the People's Republic of China, France, the United Kingdom, the states of the former Soviet Union, and/or the United States of America.

5.   **Insolvency** or financial default of any party except the **buyer**, or, if applicable, the guarantor.

6.   The failure of the **insured** or its agents to comply with all the material laws and regulations in connection with the **goods insured**.

7.   Sales made on terms of cash in advance, cash on delivery, and confirmed or unconfirmed irrevocable letter of credit.

B.   Any **loss(es)** relating to any of the following **buyers** and/or receivables shall not constitute **loss** and are not covered under this policy unless otherwise agreed in writing by the Company:

1.   Any **buyer** that as of the first day of the **policy period** is **insolvent** or more than sixty (60) days past due in any payment obligations to the **insured** unless the total aggregate amount of such past due payment obligations does not exceed the **non qualifying loss amount**. Payment obligations that are **disputed** will not be considered past due for the purposes of this paragraph.

2.   Any receivables that are purchased or otherwise acquired by the **insured** from any other person or entity or sold or otherwise transferred by the **insured** to any other person or entity.

3.   Any corporation, proprietorship, partnership or entity that controls, is controlled by or is in common control with the **insured**.

## IV.   WARRANTIES AND COVENANTS

The **insured** warrants and agrees:

A.   To cease all shipments to any **buyer** that becomes **insolvent** and when and for so long as any **buyer** is more than sixty (60) days past due in any payment obligation to the **insured** which, in the aggregate, exceeds the **non qualifying loss amount**. Payment obligations that are **disputed** will not be considered past due for the purposes of this paragraph.  Notwithstanding anything to the contrary herein, the **insured** may continue to make shipments to a buyer that is **insolvent** but no amounts owed with respect to such shipments shall be covered hereunder.

B.   To establish the invoice values of **eligible shipments** as valid and legally enforceable obligations of the **buyer** to the **insured**.

C.   To use all measures to prevent and to minimize **loss**.

D.   To retain for its own account without recourse to any party the amount of the **deductible**, and the amount of any indebtedness owing to the **insured** by any **buyer** that exceeds the applicable **buyer limit**.

E.   Not to extend initial terms of payment to a **buyer** for a period longer than the **maximum terms of payment**, and not to reschedule, extend or change any **due dates** without the written consent of the Company. In the event that the **buyer** is unable to make payment on the original **due date**, the **insured** may extend the original **due date** one (1) time during the **policy period** for the **buyer**, provided the extension is in writing and for a period not to exceed the **maximum extension period**.

F.   That if any payment obligation is **disputed** in whole or in part, the **disputed** amount shall not be part of the **loss** until such **disputed** amount has been finally determined to be a valid and legally sustainable obligation of the **buyer**.  The **insured** is responsible for the resolution of any such **disputes** and any related costs and expenses.

G.   That the credit control procedures attached by endorsement to this policy shall apply to all **eligible shipments** and that it will not vary such credit procedures in any material way without the advance written agreement of the Company. Any additional **insured** added by endorsement to this policy is subject to the same credit control procedures.

H.   That the statements contained in the application and any attachments thereto, which are hereby part of the policy, are true and that no material information has been withheld. Furthermore, that the **insured** has no knowledge at policy inception of any circumstances that may reasonably be expected to result in a **loss** hereunder, except for that which is specifically disclosed about particular **buyers** in the application.  The **insured** warrants that all information given by the **insured** to the Company after the inception of the **policy period** will be true to the best of the **insured's** knowledge.

## V.    PROOF OF PAYMENT OF CLAIMS AND RECOVERIES

A.    Indemnification by the Company shall be calculated as follows, subject always to the **policy limit of liability**, **country limit of liability** and any applicable **waiting period**:

    1.    Calculate the amount of the **loss**.

    2.    Subtract the remaining **deductible** from the lesser of either the amount of the **loss** or the applicable **buyer limit**.

    3.    Multiply the **insured percentage** by the amount determined above.

B.    If the **eligible shipments** that comprise the **loss** were made in two consecutive **policy periods**, and such **eligible shipments** were made within a ninety (90) day period between the first and the last of the **eligible shipments** that comprise the **loss**, then the **deductible** applicable to the **policy period** in which the majority of the **eligible shipments** by value were made will be applied to the **loss**.

C.    The payment for a **loss** shall be made in either U.S. Dollars or in **contract currency** at the Company's sole option, after the submission by the **insured** of a satisfactory proof of **loss** on the form prescribed by the Company and attached hereto.

For the purpose of any calculation required in the settlement of a **loss**, the rate of exchange shall be the rate as offered on the **due dates** by a New York commercial bank selected by the Company.

Each payment made by the Company hereunder shall reduce the **policy limit of liability** and all other applicable limits by the amount of such payment.

D.    The responsibility for proving a **loss** under this policy and evidencing that all conditions and warranties have been complied with shall at all times rest with the **insured**.

E.    For the purpose of calculation of a **loss**, all funds or salvage received from the **buyer** or from any other source whatsoever as or towards payment of the **buyer's** obligations to the **insured** after the **buyer** is in default of any payment obligation to the **insured**, or is **insolvent**, whichever happens first, shall be applied in chronological order of **due dates** until the Company indemnifies the **insured** for the **loss**.  In the event of a settlement with the **buyer** involving a discount of a **contract of sale** or the sale of a **contract of sale** to a third party, all funds paid in the settlement or proceeds from the sale shall reduce the **buyer limit**, irrespective of the existence of coverage for the settled or sold **contract of sale**.

After payment of a **loss**, any such funds or salvage shall be immediately paid to the Company and shared between the Company and the **insured** as follows:

    1.    The Company shall receive the **insured percentage** of all sums recovered, and the **insured** shall receive the remaining percentage of such sums, until the amount of the Company's payment of a **loss** and the Company's cost of recovery have been fully reimbursed.

    2.    All further sums recovered shall inure to the benefit of the **insured**.

The application of funds described in this SECTION V., E., shall apply regardless of any designation of funds by the **buyer** or any other party unless specifically agreed in writing by the Company.

This SECTION V., E., does not apply to any funds received in payment for goods shipped to a **buyer** after it is **insolvent**.

F.  Sums recovered in respect of any **loss** retained by the **insured** under the **deductible** shall reinstate the **deductible** by the same amount.

G.  Unless a buyer is **insolvent**, an acceleration of **due dates** shall not give rise to a corresponding acceleration of the Company's obligation to make a **loss** payment hereunder. The Company shall be liable for payment of a **loss** based only on the original **due dates** or **due dates** rescheduled with the written consent of the Company so long as the **buyer** is not **insolvent**.  The Company shall make an accelerated payment of a **loss,** net of any unearned interest, only with respect to an **insolvent buyer** for whom a receiver, trustee, liquidator, custodian or similar representative has publicly acknowledged the total value of the amounts due.

H.  In the event of any payment of a **loss** under this policy, the Company shall be subrogated to all of the **insured's** rights of recovery against any person or organization, and the **insured** shall execute and deliver all instruments and papers and do whatever else is necessary to secure such rights, including rights with respect to amounts that have been applied to the **deductible** or are in excess of the applicable **buyer limit**, **country limit of liability** or **policy limit of liability**. The Company shall have the right to direct the manner in which such assets shall be liquidated.  The **insured** shall do nothing to prejudice such rights.

It shall be a condition to the obligation of the Company to make any payment of a **loss** under this policy that the receivables to which it shall be subrogated shall not be subject to any lien, security interest or other third party claim superior to that of the Company.

## VI. GENERAL CONDITIONS

A.  ACCOUNTING PRINCIPLES:

All financial statements and accounts as well as the calculation of any **loss** hereunder shall be in accordance with the principles of accounting generally accepted in the **insured's** country, consistently applied.

B.  ACTION AGAINST COMPANY:

No action or arbitration proceedings arising out of this policy may be brought against the Company unless the **insured** has complied fully with all terms of this policy and such action is commenced within twelve (12) months following the last day of the **policy period** or within ninety (90) days after the Company's first disposition of a specific claim which is the cause of the action or proceeding, whichever event occurs later.

C.  ARBITRATION:

Should any dispute arise between the **insured** and the Company under this policy which cannot be settled amicably, the matter in dispute shall be referred to three persons in New York, one to be appointed by each of the parties hereto, and the third by the two so chosen who shall act as chairman of the proceedings.   Should either the **insured** or the Company fail to appoint an arbitrator or should the two arbitrators so chosen fail to agree on a third arbitrator, then the parties to the arbitration shall apply to the appropriate federal or state court in New York City for the appointment of such arbitrator.   The decision of the arbitrators, or that of any two of them, shall be final and conclusive of all disputes and controversies between the **insured** and the Company relating to the matters in issue.   No award of the arbitrators or judgment of any court with respect to any award, dispute or controversy shall be entered in an amount exceeding the applicable limits set forth in this policy.

D.  ASSIGNMENT:

This policy is not assignable.   Any **loss** under this policy may be paid, after adjustment with the **insured**, to a named **loss** payee if such action is agreed by the Company in writing.

E.  CANCELLATION:

1.  The **insured** is not permitted to cancel this policy.   The Company is not permitted to cancel this policy, or any limit hereunder, except for nonpayment of premium or pursuant to SECTION VI., F., or VI., H. If the premium has been financed by an affiliate of the Company, any non-payment of an installment payment on that loan shall constitute nonpayment of premium for purposes of this paragraph.

2.  In the event of cancellation by the Company, the Company shall notify the **insured** in the manner provided by SECTION VI., L., hereof, by mailing written notice stating when, not less than ten (10) days thereafter, the cancellation shall be effective.   Upon the effective date of cancellation, the policy shall be voided and no **loss** shall be eligible for payment. The mailing of such notice shall be sufficient proof of notice. The Company shall have no obligation under this policy until the premium has been paid.

F.   CHANGE IN THE COMPOSITION OF THE INSURED:

The **insured** shall notify the Company immediately in writing if, during the **policy period**, it consolidates or merges with, or sells all or substantially all of its assets to any other person or entity or if another person or entity should acquire ownership directly or indirectly of more than fifty percent (50%) of its voting share capital.  Upon receipt of such notice, the Company may cancel this policy effective with the date of such change in the composition or control of the **insured**.  If the policy is canceled, a pro-rata return of premium shall be made by the Company.

G.   CHOICE OF LAW:

The construction, validity and performance of this policy shall be governed by the laws of the State of New York. Terms of this policy which are in conflict with the statutes of the jurisdiction wherein this policy is issued are hereby amended to conform to such statutes.

H.   CONCEALMENT, MISREPRESENTATION, NON-DISCLOSURE, OR FRAUD:

This policy shall be cancelled and coverage denied in the case of intentional concealment, misrepresentation or non-disclosure, or fraud by any **insured** of a material fact concerning this insurance or the procurement thereof. Also, this policy shall become void and all claims made and premium paid hereunder shall be forfeited, and all payments made by the Company shall be returned with interest thereon by the **insured** upon demand.

I.   INSPECTIONS:

The Company may at any time, in connection with a **loss** or proof of a **loss**, examine or require to be produced copies of any corporate records or books, internal documents and correspondence, letters, or other documentation or records in whatever form and wherever situated in the possession or control of the **insured** relating to or connected with this policy or to any transaction between the **insured** and a **buyer**.  The **insured** shall, at the request of the Company, take any and all reasonable steps to obtain for the Company any and all of the aforesaid information in the possession of any other person relating to or connected with this policy or any **loss** hereunder.

J.   LIMITS OF LIABILITY:

Each **buyer limit** and **country limit of liability** under this policy and any preceding or future policies issued by the Company for the **insured** is non-cumulative. When more than one limit is issued for a **buyer** under a policy, the limit in effect for the **buyer** on the relevant shipment date(s) will be the applicable limit for **loss** adjustment purposes.  Within each **policy period**, the highest **buyer limit** in effect for the **buyer** is the maximum limit of liability for that **buyer**.  No more than one maximum limit of liability shall be in effect for any one **buyer** or for any one **buyer's country** regardless of the number of years this policy or any prior, replacement or renewal policy is in force.

K.   OTHER INSURANCE:

The insurance provided under this policy shall be excess over any other valid bond, insurance or other indemnity. The **insured** shall inform the Company of any bond, insurance or other indemnity in place at the inception of the policy or as they may arise during the **policy period**.

L.   NOTICES:

All notices provided for in this policy shall be in writing (including by electronic transmission) and given to the **insured** at the address stated in Item 1 of the Declarations or to the Company c/o Global Trade and Political Risk Division at 175 Water Street, 14th Floor, New York, NY 10038 with a copy to: N/A_____.

M.  REPORTING:

1.  The **insured** shall give immediate written notice to the Company as soon as it is aware that any **buyer** with an outstanding balance in excess of the **non qualifying loss amount** may be in financial difficulty or is **insolvent**.

2.  The **insured** shall report to the Company quarterly, within thirty (30) days after each quarter of the **policy period**, an aging of accounts receivable for any **buyer** that is more than sixty (60) days past due in any payment obligation to the **insured** which, in the aggregate, exceeds the **non qualifying loss amount**. Payment obligations that are **disputed** will not be considered past due for the purposes of this paragraph.

N.  CLAIMS REPORTING

The **insured** must submit a written proof of a **loss** acceptable to the Company:

1.  Within a reasonable period after the date of **loss; or**,

2.  Upon demand by the Company.

It is understood that the written proof of a **loss** may be amended from time to time by the **insured** without prejudice to its claim.

O.  PAYMENT OF PREMIUM:

1.  The minimum and deposit premium shall be payable to the Company within thirty (30) days of the effective date of this policy (subject to paragraph 2 below). Any additional or adjustment premiums shall be payable to the Company within fifteen (15) days of the date of billing. Any minimum and deposit premium is fully earned at the inception of this policy.

2.  Any premium which is not payable in full at the inception of this policy shall be fully due and payable immediately in the event a proof of a **loss** is submitted.

By signing below, **our** President and the Secretary on **our** behalf agree to all the terms of this policy.

Secretary
Tanya Kent

President
David H. McElroy

This policy shall not be valid unless signed at the time of issuance by our authorized representative on the Declarations of the policy.

**ENDORSEMENT NO. 1**

This endorsement, effective 12:01 A.M. **June 1, 2020**, forms a part of Policy No. **11184726-20** issued to **Exclusive Group Holdings, Inc.** by, **National Union Fire Insurance Company of Pittsburgh, PA**.

### COUNTRY LIMITS OF LIABILITY AND WAITING PERIODS

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**DOMESTIC AND EXPORT CREDIT INSURANCE**

As respects this endorsement only, Declarations, ITEM VII., **Country Limits of Liability**, shall be amended to include the following:

| Country | Country Limit of Liability | Waiting Period |
|---------|---------------------------|----------------|
| Canada | $400,000 | 90 Days, None for Insolvency |
| Croatia | $100,000 | 180 Days |
| Malaysia | $500,000 | 180 Days |
| Pakistan | $250,000 | 270 Days |
| Spain | $200,000 | 180 Days |
| United Kingdom | $1,500,000 | 120 Days |
| United States of America | $4,000,000 | 90 Days, None for Insolvency |

[1]USA includes **buyers** located in Alaska, Hawaii, and within the 48 contiguous United States of America only.

Only those countries named above are covered by this policy.

All other terms, conditions, and exclusions of this policy shall remain unchanged.

_____
AUTHORIZED REPRESENTATIVE
July 9, 2020

110109 (11/11)

**ENDORSEMENT NO. 2**

This endorsement, effective 12:01 A.M. **June 1, 2020**, forms a part of Policy No. **11184726-20** issued to **Exclusive Group Holdings, Inc.** by, **National Union Fire Insurance Company of Pittsburgh, PA**.

**PREMIUM ENDORSEMENT**
**RATE ON ELIGIBLE SHIPMENTS**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**DOMESTIC AND EXPORT CREDIT INSURANCE POLICY**

On the Declarations, ITEM IV., Premium, is amended to include the following:

1. The minimum and deposit premium for the **policy period** shall be $**161,000**.

2. The portion of minimum and deposit premium attributable to coverage for Acts of Terrorism as defined under Sec. 102, Definitions, of the Terrorism Risk Insurance Act of 2002, as amended, shall be **N/A** .

3. The adjustment premium for the **policy period** shall be calculated using the following rate(s):

   **0.10%**

   The rate(s) above shall be applied to the invoice value of the actual annual **eligible shipments** made during the **policy period**. If the calculated adjustment premium is greater than the minimum and deposit premium noted in item 1. above, plus any adjustment premium previously paid, then the balance shall be immediately due and payable.

4. Reporting of **eligible shipments**:

   The **insured** shall report the invoice value of **eligible shipments** within thirty (30) days of each report date noted below.

Report Dates

| September 1, 2020 | March 1, 2021 |
|---|---|
| December 1, 2020 | June 1, 2021 |

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of this policy except as hereinabove set forth.

AUTHORIZED REPRESENTATIVE
July 9, 2020

110121 (11/11)

ENDORSEMENT NO. 3

This endorsement, effective 12:01 A.M. **June 1, 2020**, forms a part of Policy No. **11184726-20** issued to **Exclusive Group Holdings, Inc.** by, **National Union Fire Insurance Company of Pittsburgh, PA**.

<u>**FLORIDA AMENDATORY ENDORSEMENT**</u>

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

*This endorsement modifies insurance provided under the following*:

DOMESTIC AND EXPORT CREDIT INSURANCE SHIPMENTS FORM

**I.**     The **POLICY DECLARATIONS** are amended to include the following:

XVII.    Endorsements Which Attach to and Form Part of This Policy:

| Title | Form No. | Edition Date |
|---|---|---|
| Country Limits of Liability and Waiting Periods | 110109 | 11/11 |
| Florida Addendum To The Declarations | 74825 | 09/13 |
| Premium Endorsement-Rate on Eligible Shipments | 110121 | 11/11 |
| Florida Amendatory Endorsement | 110166 | 10/12 |
| Exclusions Endorsement | 110114 | 11/11 |
| Economic Sanctions Endorsement | 89644 | 06/13 |
| Electronic Listing Of Buyer Limits Endorsement (With Country Limits Of Liability) | 117101 | 06/14 |
| Loss Payee Endorsement Amendment to Warranties And Covenants | 110115 | 11/11 |

**II.**     The final sentence of the **POLICY DECLARATIONS** is deleted in its entirety and replaced with the following:

This policy is the entire agreement between the **Insured** and the Company and no terms or conditions or representations of this policy shall be waived or changed, unless agreed to in writing by an authorized representative of the Company.

**III.**     SECTION III., **EXCLUSIONS**, A. 2. is deleted in its entirety and replaced with the following:

2.  Any material breach of or inaccuracy regarding any representations made herein, or failure to perform or to fulfill any covenant or agreement made herein by the **insured**.

**IV.**     SECTION IV., **WARRANTIES AND COVENANTS** is hereby renamed **REPRESENTATIONS AND COVENANTS** and all references in the policy to "SECTION IV. WARRANTIES AND COVENANTS" shall be understood to mean "SECTION IV. REPRESENTATIONS AND COVENANTS."

**V.**     The first sentence of SECTION IV., **WARRANTIES AND COVENANTS**, is deleted in its entirety and replaced with the following:

The **insured** represents and agrees:

**VI.**     SECTION IV., **WARRANTIES AND COVENANTS**, H. is deleted in its entirety and replaced with the following:

> H.  That the statements contained in the application and any attachments thereto, which are hereby part of the policy, are true and that no material information has been withheld. Furthermore, that the **insured** has no knowledge at policy inception of any circumstances that may reasonably be expected to result in a **loss** hereunder, except for that which is specifically disclosed about particular **buyers** in the application.   The **insured** represents that all information given by the **insured** to the Company after the inception of the **policy period** will be true to the best of the **insured's** knowledge.

**VII.**    SECTION V., **PROOF OF PAYMENT OF CLAIMS AND RECOVERIES**, D. is deleted in its entirety and replaced with the following:

> D.  The responsibility for proving a **loss** under this policy and evidencing that all conditions and representations have been complied with shall at all times rest with the **insured**.

**VIII.**   SECTION VI., **GENERAL CONDITIONS**, paragraph **ACTION AGAINST US**, is deleted in its entirety and replaced by the following:

> **ACTION AGAINST US:** No suit, action or proceeding for recovery of any **loss** under this Policy will be sustainable in any court of law, equity or other tribunal unless all the requirements of this Policy are complied with and the same be commenced within five (5) years next after a Statement of Loss has been filed with **us** by **you.**

**IX.**     SECTION VI., **GENERAL CONDITIONS**, paragraph **C. ARBITRATION**, is hereby deleted in its entirety and replaced by the following:

> **C.  ARBITRATION:**   Should any dispute arise between **you** and **us** under this policy which cannot be settled amicably, both parties must be in agreement to voluntarily enter into arbitration and to mutually agree to make it binding at the time of the dispute. The matter in dispute shall be referred to three persons in Florida, one to be appointed by each of the parties hereto, and the third by the two so chosen who shall act as chairman of the proceedings, or such other procedure as is currently in accordance with the rules of the American Arbitration Association. Should either **you** or **we** fail to appoint an arbitrator or should the two arbitrators so chosen fail to agree on a third arbitrator, then the parties to the arbitration shall apply to the appropriate federal or state court in Florida for the appointment of such arbitrator. No award of the arbitrators or judgment of any court with respect to any award, dispute or controversy shall be entered in an amount exceeding the applicable limits set forth in this policy. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Florida, without giving effect to any conflict of laws principles that would cause the application of the laws of any other jurisdiction, and any disputes concerning this Agreement and/or the Proposal shall be subject to the exclusive jurisdiction of the federal courts in Florida, or if such courts do not have jurisdiction then the state courts of Florida.

**X.**      SECTION VI., **GENERAL CONDITIONS**, paragraph **G. CHOICE OF LAW AND FORUM**, is deleted in its entirety and replaced by the following:

**G. CHOICE OF LAW:** The construction, validity and performance of this Policy will be governed by the laws of the U.S.A. and the State of Florida.

**XI.** SECTION VI., **GENERAL CONDITIONS**, paragraph, **H. CONCEALMENT, MISREPRESENTATION, OR FRAUD**, is deleted and replaced by the following:

**H. CONCEALMENT, MISREPRESENTATION, OR FRAUD**:
This policy may be null and void in case of fraud, concealment, or intentional misrepresentation by **you** or an **insured** of a material fact concerning:

1.      this policy or the procurement thereof; or

2.      an **insured**; or

3.      **your** interest in any other person or organization qualifying as an **insured** under this Policy; or

4.      any **loss** or claim presented to **us** under this policy.

We may seek any and all remedies in law and/or equity that we may have against **you** and/or any other person or organization qualifying as an **insured** resulting from **your** and/or any **insured's** fraud, concealment or intentional misrepresentation of any material fact concerning this policy or procurement thereof, an **insured**, or any **loss** or claims presented to **us** under this policy.

**XII.** SECTION VI., **GENERAL CONDITIONS**, paragraph, **NOTICE**, is amended to include the following:

To obtain information concerning coverage and for assistance, the insured may call us toll free at 1-877-867-3783.

All other terms, conditions, and exclusions of this policy shall remain unchanged.

_____
AUTHORIZED REPRESENTATIVE
July 9, 2020

110166 (10/12)

**ENDORSEMENT NO. 4**

This endorsement, effective 12:01 A.M. **June 1, 2020**, forms a part of Policy No. **11184726-20** issued to **Exclusive Group Holdings, Inc.** by, **National Union Fire Insurance Company of Pittsburgh, PA**.

**EXCLUSIONS ENDORSEMENT**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**DOMESTIC AND EXPORT CREDIT INSURANCE POLICY**

As respects this endorsement, SECTION III., EXCLUSIONS, subsection B., is hereby amended to include the following:

- Sales made on terms of Confirmed or Unconfirmed Irrevocable Letter of Credit.
- Sales made on terms of Cash in Advance or Cash on Delivery.
- Sales made to subsidiary or associated companies of the <u>Insured.</u>

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of this policy except as hereinabove set forth.

_____
AUTHORIZED REPRESENTATIVE
July 9, 2020

110114 (11/11)

103

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**ENDORSEMENT NO. 5**

This endorsement, effective 12:01 A.M. **June 1, 2020**, forms a part of Policy No. **11184726-20** issued to **Exclusive Group Holdings, Inc.**  by, **National Union Fire Insurance Company of Pittsburgh, PA**.

<u>**ECONOMIC SANCTIONS ENDORSEMENT**</u>

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

*This endorsement modifies insurance provided under the following:*

**DOMESTIC AND EXPORT CREDIT INSURANCE POLICY**

The Insurer shall not be deemed to provide cover and the Insurer shall not be liable to pay any claim or provide any benefit hereunder to the extent that the provision of such cover, payment of such claim or provision of such benefit would expose the Insurer, its parent company or its ultimate controlling entity to any sanction, prohibition or restriction under United Nations resolutions or the trade or economic sanctions, laws or regulations of the European Union or the United States of America.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of this policy except as hereinabove set forth.

_____
AUTHORIZED REPRESENTATIVE
July 9, 2020

89644 6-13

**ENDORSEMENT NO. 6**

This endorsement, effective 12:01 A.M. **June 1, 2020**, forms a part of Policy No. **11184726-20** issued to **Exclusive Group Holdings, Inc.** by, **National Union Fire Insurance Company of Pittsburgh, PA**.

## ELECTRONIC LISTING OF BUYER LIMITS ENDORSEMENT
### (With Country Limits of Liability)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

DOMESTIC AND EXPORT CREDIT INSURANCE POLICY

**I.** The **POLICY DECLARATIONS** are hereby amended to include the following:

> **Uniform Resource Locator**: https://www-222.aig.com/globallimits/

**II.** **SECTION II., DEFINITIONS**, C., **Buyer Limit**, is deleted in its entirety and replaced with the following:

> C. **Buyer Limit** means the limit specified by the Company for that **buyer**. If no such limit has been specified by the Company, then an amount not exceeding the **discretionary credit limit,** as specified in ITEM VI., of the Declarations, provided such amount has been approved in writing by the **insured** for that **buyer** at the time of or prior to shipment. **Buyer limits** specified by the Company shall be listed in the **Uniform Resource Locator** of the Company and remain available for review by the **insured**.

**III.** **SECTION II., DEFINITIONS**, F., **Country Limit of Liability**, is deleted in its entirety and replaced with the following:

> F. **Country Limit of Liability** means the Company's maximum liability for all **loss** in each particular country specified by the Company.

**IV.** Solely with respect to coverage afforded by this endorsement, **SECTION VI.**, **GENERAL CONDITIONS**, is amended include the following:

> At policy inception, the Company shall provide the **insured** and the **broker** individual passwords to access the **Uniform Resource Locator. Buyer limits** and **country limits of liability** specified by the Company shall be listed in the **Uniform Resource Locator** and remain available for review by the **insured** or the **broker.** The **buyer limits** and **country limits of liability** listed in the **Uniform Resource Locator** for the **insured** shall be deemed to be attached to this policy and shall be the sole record of **buyer limits** and **country limits of liability** specified by the Company.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of this policy except as hereinabove set forth.

_____
AUTHORIZED REPRESENTATIVE
July 9, 2020

117101 (06/14)

**ENDORSEMENT NO. 7**

This endorsement, effective 12:01 A.M. **June 1, 2020**, forms a part of Policy No. **11184726-20** issued to **Exclusive Group Holdings, Inc.**  by, **National Union Fire Insurance Company of Pittsburgh, PA**.

<u>**LOSS PAYEE ENDORSEMENT**</u>

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**DOMESTIC AND EXPORT CREDIT INSURANCE POLICY**

As respects this endorsement, SECTION VI., **ASSIGNMENT**, subsection D., it is understood and agreed that any amounts payable under this policy shall be paid to the **insured** and/or to the following parties as their interests may appear:

>Arete Global, LLC
>2117 Modena Ct.
>Naples, FL 34105
>Ph: 239-877-7557

It is further understood and agreed that any claims filed in connection with a **loss** under the policy will be adjusted with the **insured** and that the loss payee named above will have no rights to pursue a claim directly against the **company** or assume any other rights under this policy.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of this policy except as hereinabove set forth.

_____
AUTHORIZED REPRESENTATIVE
July 9, 2020

110115 (11/11)

**ENDORSEMENT NO. 8**

This endorsement, effective 12:01 A.M. **June 1, 2020**, forms a part of Policy No. **11184726**-**20** issued to **Exclusive Group Holdings, Inc.**  by, **National Union Fire Insurance Company of Pittsburgh, PA**.

<u>**AMENDMENT TO WARRANTIES AND COVENANTS**</u>

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

This endorsement modifies insurance provided under the following:

**DOMESTIC AND EXPORT CREDIT INSURANCE**

Article **IV, WARRANTIES AND COVENANTS**, A is deleted in its entirety and replaced with the following:

The **insured** warrants and agrees:

A.     To cease all shipments to any **buyer** that becomes **insolvent** and when and for so long as any **buyer** is more than thirty (30) days past due in any payment obligation to the **insured** which, in the aggregate, exceeds the **non qualifying loss amount**. Payment obligations that are **disputed** will not be considered past due for the purposes of this paragraph.  Notwithstanding anything to the contrary herein, the **insured** may continue to make shipments to a buyer that is **insolvent** but no amounts owed with respect to such shipments shall be covered hereunder.

Nothing herein contained shall be held to vary, alter, waive or change any of the terms, limits or conditions of this policy except as hereinabove set forth.

_____
AUTHORIZED REPRESENTATIVE
July 9, 2020

108

# EXHIBIT D

Case 2:22-cv-00474-JES-NPM   Document 15   Filed 08/25/22   Page 110 of 125 PageID 530

## BUYER LIMIT DETAILS

### Policy Information

| | |
|---|---|
| **Insured:** EXCLUSIVE GROUP HOLDINGS LLC | **Policy No:** 11184726-20 |
| **Policy Period:** 01 Jun 20 - 01 Jun 21 | |

### Buyer Information

| | |
|---|---|
| **Buyer Name:** Phone Works, Inc. | **DUNS:** 024359039 |
| **Address:** 405 S Federal Hwy 29 Pompano Beach, FL 33062 | **Local Business ID:** |
| **Country:** UNITED STATES OF AMERICA | **Internal ID:** |
| **Phone:** (754) 202-5346 | **SIC:** 1623 - Wtr, Swr Pplns & Comunicatns & Powr Ln Cnstrn |

### Global Ultimate Information

| | |
|---|---|
| **Name:** Phone Works, Inc. | **DUNS:** 024359039 |
| **Country:** UNITED STATES OF AMERICA | |

### Endorsed Limit Information

| | |
|---|---|
| **Endorsement No:** | **Expiration Date:** 01 Oct 20 |
| **Effective Date:** 01 Jun 20 | **Approved Limit:** 450,000 USD |
| **Requested Limit:** 750,000 USD | **Terms of Payment:** 15 days |
| **Insured Percentage:** 90.0 % | |
| **Blaze Reason:** | |
| **Special Limit Conditions:** This buyer limit will expire October 1, 2020. Please provide financials to consider further extension. | |
| **Comments:** | |

# EXHIBIT E

**From:** tradecredit@aig.com 📎
**Subject:** Partial or Zero Limit Approval for Phone Works, Inc. on EXCLUSIVE GROUP HOLDINGS LLC Policy: 11184726-19
**Date:** September 5, 2019 at 2:45 PM
**To:** Mary.Mooney@ExclusiveGroupHoldings.com, mary@exclusive-group.co.uk, pam@traderiskgroup.com
**Cc:** Jasmina.Vigil@aig.com

A limit request for Phone Works, Inc. on policy EXCLUSIVE GROUP HOLDINGS LLC 11184726-19 was received and the decision is stated below:

| | |
|---|---|
| Insured: | EXCLUSIVE GROUP HOLDINGS LLC |
| Policy: | 11184726-19 |
| Buyer: | Phone Works, Inc. |
| DUNS: | 024359039 |
| Internal ID: | |
| Buyer Address: | 405 S Federal Hwy 29 Pompano Beach, FL 33062, US |
| Country: | UNITED STATES OF AMERICA |
| | |
| Requested Date: | 21 Aug 2019 |
| Requested Limit: | USD 750,000.00 |
| | |
| Endorsed Limit: | USD 450,000.00 |
| Effective Date: | 01 Sep 2019 |
| Expiration Date: | 01 Jun 2020 |
| Special Conditions: | |
| Underwriter Comments: | |
| | |
| Additional Information: | |

**Supporting documents were sent to the underwriter**

| | |
|---|---|
| Underwriter: | Jasmina Vigil |
| Contact Number: | (713) 342-7463 |

Click on the link to go to the login page of Global Limits: Global Limits

AIG is the marketing name for the worldwide property-casualty, life and retirement, and general insurance operations of American International Group, Inc. For additional information, please visit our website at www.aig.com.
All products and services are written or provided by subsidiaries or affiliates of American International Group, Inc.
Products or services may not be available in all jurisdictions, and coverage is subject to actual policy language.
Non-insurance products and services may be provided by independent third parties. Certain property-casualty coverages may be provided by a surplus lines insurer. Surplus lines insurers do not generally participate in state guaranty funds and insureds are therefore not protected by such funds.

View our Privacy Policy.

Copyright © 2012 American International Group, Inc. All rights reserved.
175 Water Street | New York | NY 10038



# EXHIBIT F

**From:** **Mary Mooney** mary.mooney@exclusivegroupholdings.com  📎
**Subject:** Re: Limit Request Support for EXCLUSIVE GROUP HOLDINGS LLC Policy #11184726-19 on Buyer Phone Works, Inc. Country UNITED STATES OF AMERICA
**Date:** September 5, 2019 at 2:40 PM
**To:** Vigil, Jasmina Jasmina.Vigil@aig.com
**Cc:** Pam Wicke Pam@traderiskgroup.com



Jasmina,

Understood and confirmed. Thank you.

Mary Mooney
+1 239 307 8877

On Sep 5, 2019, at 2:30 PM, Vigil, Jasmina <Jasmina.Vigil@aig.com> wrote:

Hi Mary,

Thank you for confirming the DUNS number. I can do $450K on Phone Works, Inc. considering the negative cash flow. Let me know if that you are  agreeable and I'll update GL.

Thank you.

Jasmina

Jasmina Vigil
AIG
Senior Underwriter | Trade Credit | South Zone
2929 Allen Parkway, Floor 12, Houston, TX 77019
T: 713.342.7463  C:281.384.6423
<image002.png>

---

**From:** Mary Mooney [mailto:mary.mooney@exclusivegroupholdings.com]
**Sent:** Wednesday, September 04, 2019 5:01 PM
**To:** Vigil, Jasmina
**Cc:** Pam Wicke
**Subject:** [EXTERNAL] Re: Limit Request Support for EXCLUSIVE GROUP HOLDINGS LLC Policy #11184726-19 on Buyer Phone Works, Inc. Country UNITED STATES OF AMERICA

This message is from an external sender; be cautious with links and attachments.

Jasmina,

DUNS is confirmed (number 024359039). Please review and advise.

Thanks,
Mary
<image003.png>

Mary Mooney
CFO

mobile: +1 (239) 307-8877

114

mobile: +1 (239) 307-8877
email: mary@exclusive-group.co.uk | Mary.Mooney@ExclusiveGroupHoldings.com
web:  www.exclusivegroupholdings.com

Exclusive Group Holdings, Inc.
780 Fifth Avenue South
Suite 200
Naples, Florida 34102

On Aug 21, 2019, at 2:44 PM, Mary Mooney
<mary.mooney@exclusivegroupholdings.com> wrote:

Jasmina,

Let me confirm the DUNS and get back to you.

Thanks!
Mary

On Aug 21, 2019, at 2:30 PM, Vigil, Jasmina <Jasmina.Vigil@aig.com> wrote:

Hi Mary,

The address in the portal is pulled from D&B. They need to update D&B information if
different. Please confirm with them if their DUNS is 024359039 just to make sure?
Also please let me know if you have prior trading experience with them?

Thanks.

Jasmina

Jasmina Vigil
AIG
Senior Underwriter | Trade Credit | South Zone
2929 Allen Parkway, Floor 12, Houston, TX 77019
T: 713.342.7463  C:281.384.6423
<image001.png>

From: Mary Mooney [mailto:mary.mooney@exclusivegroupholdings.com]
Sent: Wednesday, August 21, 2019 12:16 PM
To: Vigil, Jasmina
Subject: [EXTERNAL] Limit Request Support for EXCLUSIVE GROUP HOLDINGS LLC Policy
#11184726-19 on Buyer Phone Works, Inc. Country UNITED STATES OF AMERICA

This message is from an external sender; be cautious with links and attachments.

Jasmina,

Attached please find the financial statements for Phone Works.

Also, the address in the AIG portal doesn't exactly match the information I received from the customer.  I cross-checked their information against the Florida Secretary of State website and noticed that the state's information matches the information I received from the customer but not the portal. I am showing that the correct registered address for this customer is:

405 S. Federal Hwy Suite 300
Pompano Beach, FL 33062

The AIG portal shows the address as:

405 S. Federal Hwy 29
Pompano Beach, FL 33062

I just want to make sure we are reviewing the same/correct company information.

Thank you in advance for your assistance. Please advise if additional is needed to assess a limit.

Regards,
Mary


<image002.png>


Mary Mooney
CFO

mobile: +1 (239) 307-8877
email: mary@exclusive-group.co.uk | Mary.Mooney@ExclusiveGroupHoldings.com
web:  www.exclusivegroupholdings.com

Exclusive Group Holdings, Inc.
780 Fifth Avenue South
Suite 200
Naples, Florida 34102





# EXHIBIT G



**From:** **Mary Mooney** mary.mooney@exclusivegroupholdings.com
**Subject:** Re: Request to Add Endorsed Country
**Date:** May 4, 2020 at 4:36 PM
**To:** Vigil, Jasmina Jasmina.Vigil@aig.com
**Cc:** Jay Tenney jay.tenney@traderiskgroup.com

Hi Jasmina,

I have pending requests for more recent financial statements to each of the customers, as our files only had through 2018. I will make the request for trade references and get back to you. Thank you for your guidance.

Mary

> On May 4, 2020, at 12:17 PM, Vigil, Jasmina <Jasmina.Vigil@aig.com> wrote:
>
> Hi Mary,
> Provided financials on Seletel are 12/17 and 12/18. Are there any more updated one?
> We will need at least 12/19 + trade references. Also we will need financials on
> Comunica IT S.A. and Swisslink Carrier.
> Thanks.
> Jasmina
> Jasmina Vigil
> AIG
> Senior Underwriter | Trade Credit | South Zone
> 2929 Allen Parkway, Floor 12, Houston, TX 77019
> T: 713.342.7463  C:281.384.6423
> <image001.png>
>
> ---
>
> **From:** Mary Mooney [mailto:mary.mooney@exclusivegroupholdings.com]
> **Sent:** Monday, May 04, 2020 7:29 AM
> **To:** Vigil, Jasmina
> **Cc:** Jay Tenney
> **Subject:** [EXTERNAL] Re: Request to Add Endorsed Country
>
> This message is from an external sender; be cautious with links and attachments.
>
> Hi Jasmina,
>
> There are three customers we are seeking in Switzerland:
>
> 1. Seletel
> 2. Comunica IT S.A.
> 3. Swisslink Carrier
>
> Thanks
> Mary
>
>
> <image002.png>
>
>
>
> On May 1, 2020, at 11:23 AM, Vigil, Jasmina <Jasmina.Vigil@aig.com> wrote:

Hi Mary,

Please provide financials 12/19 and if available 03/20 to consider the requested limit. Is this a new buyer? Are any trade references available?

Thanks.

Jasmina
Jasmina Vigil
AIG
Senior Underwriter l Trade Credit l South Zone
2929 Allen Parkway, Floor 12, Houston, TX 77019
T: 713.342.7463  C:281.384.6423
<image001.png>

---

**From:** Mary Mooney [mailto:mary.mooney@exclusivegroupholdings.com]
**Sent:** Friday, May 01, 2020 10:15 AM
**To:** Vigil, Jasmina
**Cc:** Jay Tenney
**Subject:** [EXTERNAL] Request to Add Endorsed Country


This message is from an external sender; be cautious with links and attachments.

Jasmina,

We are working on adding new markets to our customer base. One of the markets we are expanding into is Switzerland—we have three potential buyers located in that country. Please advise if we can add Switzerland as an endorsed country on our policy? The request is for a 500,000 endorsement. Let me know what is needed to support this request.

MAry

# EXHIBIT H

**AIG Claims, Inc.**
TCPRClaimsUS@aig.com



**PROOF OF LOSS FORM (COMPANIES)**
**TRADE CREDIT INSURANCE**

---

**SECTION I. CONTACT INFORMATION**

A.   INSURED NAME:_____
     Address:_____
     Contact Name:   _____E-mail Address:   _____Tel. No.:_____

B.   BUYER NAME:   _____
     Address:_____Country:_____
     Contact Name:   _____E-mail Address:   _____Tel. No.:_____

C.   BROKER NAME (if applicable): _____
     Contact Name:   _____E-mail Address:   _____Tel. No.:_____

D.   LOSS PAYEE NAME: (if applicable): _____

**SECTION II. POLICY INFORMATION**

A.   Policy No.:_____B. Policy Effective Date:_____

**SECTION III. LOSS INFORMATION**

First Claimed Shipment Date:_____First Default Date:_____   If Insolvency, Date: _____

**SECTION IV. SUMMARY OF TRANSACTIONS AND TOTAL AMOUNT CLAIMED**

Contract Currency:   _____

Total Gross Amount of Invoices Outstanding:   _____

*Less*

Partial payments:   _____

Eligible discounts:   _____

Offsets:   _____

Other Deductions:   _____

**Total Amount Claimed:**   _____

I hereby warrant and certify that the information furnished herein is true and correct, and no material fact relating to the transactions hereinabove described has been withheld. I agree to submit such additional information to, and take such action as may be requested by the Company pursuant to the policy, and to execute the Section V. Release and Assignment or alternative release and assignment form, if prescribed separately by the Company.

Signature of Authorized Representative of the Insured:_____

Print Name:_____ / Title:_____ / Date:_____

1

## **Section V.  Release and Assignment**

The **Insured** has the option of using this Section V. Release and Assignment by checking the box and signing below. This will expedite payment of this **Claim** in the event of claim approval.  The **Company** or the **Insured** may later opt out of this Section V. Release and Assignment upon providing written notice to the other party prior to issuance of an indemnity payment by the **Company**.  If either party opts out of this Section V.  Release and Assignment, a mutually agreed alternative release and assignment form must be executed by the Insured prior to the Company's
issuance of the claim payment.

***Definitions***

| | |
|---|---|
| **Policy:** | The identified **Policy** under Page 1. Section II of this Proof of Loss form |
| **Insured**: | The company named in the **Policy** as the **Insured** |
| **Buyer**: | The company named under Page 1. Section IB of this Proof of Loss form |
| **Company:** | The AIG **Company** that issued the **Policy** |

WHEREAS, the **Company** issued the **Policy** to the **Insured**;

AND WHEREAS, the **Insured** submitted a claim to the **Company** under the **Policy** on the **Buyer** (the "**Claim**");

AND WHEREAS, the **Insured** hereby represents and warrants that (1) it has good and valid legal title to the rights, privileges and claims which are the subject of this release and assignment, (2) that it has not assigned, sold, or transferred in any way whatsoever any of its rights, privileges and claims with respect to the debts, and (3) that there is not outstanding and unsettled, any dispute or any issue raised by the **Buyer** regarding claims of the **Insured** against the **Buyer**.

NOW THEREFORE, the **Insured** and the **Company** agree that, upon receipt of the indemnity payment by the **Company** to the **Insured**:

1) The **Insured** does release the **Company**  from all claims, actions, and causes of action of whatsoever character and description which the **Insured** ever had, now has or hereafter can, shall or may have relating to this **Claim**;

2)  The **Insured** does hereby assign, transfer and set over to the **Company**, their successor and assigns, all sums of money now due, or to become due from the **Buyer** and any and all contracts, security and evidences of indebtedness, to have and to hold the same, with full power to collect and enforce the same, for their own use and benefit by any action or proceeding in the name of the **Insured** or otherwise, and to provide all reasonable cooperation and perform legal steps proper or necessary in connection herewith;

3)  All sums received from the **Buyer** or any other party as or toward payment of the **Buyer's** indebtedness will be shared as provided for in the terms and conditions of the **Policy**;

4) The **Insured** agrees that if the **Buyer** obtains a binding judgment or award confirming that the amount owed by the **Buyer** to the **Insured** is lower than the approved claim amount, or the **Insured's** claim is not admitted into the **Buyer's** insolvent estate, or is admitted for an amount different than the approved claim amount, then the final amount accepted by the court (or similar type of tribunal or insolvency administrator) is the maximum that may be claimed by the **Insured** and that a revised calculation of the Indemnity payment will be made by the **Company** which may result in an additional Indemnity payment or a refund of all or part of the Indemnity payment by the **Insured** to the **Company**.

☐   **On behalf of the Insured, I hereby agree to utilize this Section V.  Release and Assignment.** _____

Signature of Authorized Representative of the Insured:_____

Print Name:_____ / Title:_____ / Date:_____

_____
Witness

2

**Attachment A: Directions and Checklist For Filing A Claim**

**Directions**

AIG Trade Credit and Political Risk Claims have moved to a paperless environment.  Please enclose copies only and retain all original documents.  We prefer that claims and other correspondence be emailed to our Group Email address at: **TCPRClaimsUS@aig.com**

If you need to send paper documents, please do so as follows:

| | |
|---|---|
| <u>All "Regular Mail" should be forward to</u>: | <u>All "Over Night Mail" should be forward to</u>: |
| *AIG Claims, Inc.* | *AIG* |
| *Attn Trade Credit Claims* | *Attn Trade Credit Claims* |
| *P.O. Box 27030* | *Attn: Tynisa Jones (tynisa.jones@aig.com)* |
| *Shawnee Mission, KS 66225* | *17200 W. 119ᵗʰ St., Olathe, KS 66061* |

**Check List**

The below checklist includes documents that are usually required to complete a review of your Claim.

☐   <u>Statement of Account</u> with the Buyer which lists all outstanding invoices.  You may use Attachment B or present a statement that includes the transaction details stated within Attachment B.

☐   <u>Past Payment History</u> (the "Ledger Experience") which lists all past payment experience with the Buyer for the periods specified under the Policy.  Generally, all past payment experience that is one year prior to Policy Inception date is sufficient.  Please ensure that the statement includes the following transaction details:

| Invoice Number(s) | Invoice Date(s) | Gross Invoice Value | Terms of Payment | Due Date(s) | Amount(s) Paid | Date(s) of Payment | Days Late |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |

☐   <u>Contract of Sale</u>
  o   Enclose copies of all invoices, purchase orders, and shipping documents, as indicated in the Policy.
  o   If the contract includes debt instrument (such as promissory notes, bills of exchange, guaranties or other relevant agreements), please enclose **copies only**.  Please retain and maintain all original negotiable debt instruments.

☐   <u>Correspondence and File Notes</u>
  o   Any written emails, letters, file notes to and from the Buyer, guarantor, obligor, recovery agent showing steps taken to effect collection and to mitigate the amount of the loss.
  o   In the case of an Insolvent Buyer, please submit documentation evidencing such Insolvency and, where applicable:
    ▪   The Insured's proof of claim as required by the bankruptcy court, and
    ▪   A list of creditors showing the Insured as a named creditor, if available.

☐   <u>Discretionary Credit Limit (DCL)</u>
  If qualification for coverage is under the DCL, please submit the documentation supporting extension of credit to the Buyer.  This might include, but may not be limited to, the Past Payment History detailed under Item 2. above, written third party credit reports / information, and the written limit for the Buyer established by the Insured.

3

**Attachment B: Statement of Account**

The below spreadsheet may be used to directly enter in all outstanding invoices:

| Invoices Number(s) | Shipment Date(s) | Invoice Date(s) | Gross Invoice Value | Terms of Payment | Due Date(s) | Amount Part Paid (if any) |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | TOTALS | | | | |

4